# SEPTEMBER TERM.

## CHARLES TOWN.

HAMILTON *et al.* *v.* TUCKER COUNTY COURT *et al.*

Submitted September 7, 1893.—Decided September 12, 1893.

1. COUNTY-SEAT—RE-LOCATION—COUNTY COURT—ENTRY ON RECORD BOOK.

   Under section 15, c. 39, Code 1891, when an election upon the re-location of a county-seat has been held, and the County Court has ascertained and declared its result and entered upon its record-book the fact, that three fifths of the votes cast were for re-location at a particular place, that place becomes by operation of law from the date of such declaration the county-seat of the county.

2. COUNTY COURT—NOTICE—SPECIAL SESSION.

   A special session of a county court can be held legally only after a notice of the time of the session, and notice of the purposes for which it is to be held have been posted by the clerk at the front door of the court-house at least two days before the session.

3. COUNTY COURT—NOTICE—SPECIAL SESSION.

   To give such special session jurisdiction in any matter, it must appear upon its record-book that such notice was so posted, and also it must appear from such entry in said record-book what were the particular purposes for which the special session was held, as stated and specified in such notice.

4. COUNTY COURT—NOTICE—SPECIAL SESSION.

   If such entry as is above described is not entered in such record-book of such special session, everything, which may be done at the special session, must be held to be an absolute nullity.

5. COUNTY SEAT—RE-LOCATION.

   Citizens and taxpayers of a county have such an interest in the matter of the re-location of a county-seat, that they may interpose in proceedings in such matter and maintain appropriate legal process touching it.

J. P. SCOTT, A. J. VALENTINE, C. O. STRIEBY, and DAYTON & DAYTON, for petitioners.

L. S. ANVIL, A. B. PARSONS, and J. HOP. WOODS, for respondents.

BRANNON, JUDGE:

This case involves the location of the county-seat of Tucker county. On April 28, 1893, an election was held in Tucker county to obtain the sense of its voters upon the question of the removal of its county-seat from St. George to Parsons, and on May 4th the County Court canvassed the returns of the election and declared and entered of record as its result, that three fifths and upwards of the votes cast were in favor of re-location at Parsons. Afterwards, on July 10th, the County Court entered an order reciting the former order declaring the result of said election and reciting, that certain persons had tendered a lease for the term of four years of a certain house at Parsons for use as a court-house, and accepting such tender, and then declaring the said house to be the court-house of said county, and the town of Parsons to be the county-seat, and ordering the removal of the county-records, papers and property pertaining to the clerk's office to said house at Parsons on the 7th day of August, and directing that bids be asked for such removal. By another order made on the said 10th of July the court awarded to Poling Bros. the contract for removing such records, papers, *etc.* On August 1st said contractors, Poling Bros., removed said records, papers and office-property from St. George to Parsons and placed them in the said house, which had been so declared the court-house of said county.

Application was made to the judge of the Circuit Court for a writ of *certiorari* to take into the Circuit Court for review and reversal the order so made by the County Court on 4th May, declaring the result of the election to have been in favor of the re-location of the county-seat; and, the writ having been refused, a writ of error and *supersedeas* was allowed by a judge of this Court on July 27, 1893, to the order of the Circuit Court judge refusing such writ of *certiorari*. On August 7, 1893, at a County Court held by two of its members, an order was entered to the effect that the records and furniture belonging to the clerk's

offices had been unlawfully removed by persons unknown on the night of the 1st and morning of the 2d of August, 1893, to the town of Parsons, and directing that they be restored and placed *in statu quo* in the clerk's office and court-house in the town of St. George, and commanding that the sheriff forthwith execute the order of restoration.

Thereupon John Hamilton and others, on behalf of themselves and all other taxpayers of Tucker county, presented to the judge of the Circuit Court a petition praying for a writ of prohibition to prohibit the County Court and sheriff from executing the last-mentioned order of the County Court requiring such records, papers and furniture to be restored to St. George; and, upon its refusal by the Circuit judge, a judge of this Court awarded a rule against said County Court and sheriff to show cause to this court why the writ of prohibition should not issue; and, the County Court and sheriff having tendered their answer to said rule, the petitioners objected to its being filed, and demurred to it as insufficient to prevent such writ of prohibition.

This answer itself demurs to the petition asking the prohibition, and we are required to say whether it calls for the writ of prohibition. We think it does. It shows that an election was held upon the re-location of the county-seat, and that the County Court declared and entered of record that more than the requisite three fifths of the votes were in favor of removal and re-location at Parsons, and that it declared Parsons to be the county-seat, if that were necessary to make it such, and that a particular building there was the lawful court-house.

The statute relating to the subject of removal of county-seats (section 15, c. 39, Code 1891) declares: "If three fifths of all the votes cast at such election upon the question be in favor of re-location at either of the places voted for, the said County Court shall enter an order declaring the place so receiving three fifths of all the votes cast therefor to be the county-seat of said county from and after said date." Another clause provides that the County Court shall examine the certificates of the votes cast at the voting places, and that "said court shall thereupon ascer-

tain and declare the result of said vote, and enter the same of record."

Now, when such an election has been held, and the County Court has ascertained its result and declared that three fifths of the votes cast are in favor of re-location at a particular place, and entered the fact in its record-book, this place is from the date of said declaration by operation of law the county-seat. It is the duty of the County Court to expressly declare it the county-seat; but that is directory in the statute; and, if it has declared the result of the election, and that the requisite three fifths vote is in favor of re-location at a particular place, that alone in law removes the county-seat to the new place; otherwise, the popular will would be defeated. The statute plainly means that if three fifths of the voters vote for the re-location, and it be so found and declared and entered by the County Court, from that date—the date of such declation—the new point is the county-seat.

In one clause the statute provides for the ascertainment by the County Court whether a three fifths vote has been cast for re-location, and by another clause it enacts that if such vote has been cast, the place receiving such vote shall thenceforth be the county-seat. It is the vote, when so ascertained to be a three fifths vote, that works the change. All else is directory or ministerial. Having made the provisions adverted to the statute in other clauses goes on to direct the court, as soon as practicable, to cause the records, papers and property to be removed to the new county-seat; but that is simply ministerial—simply something done to enable business to be carried on at the new point. Whether the records are there or not, it is the legal county-seat.

Thus, when on May 4th the County Court declared that three fifths of the votes had been cast for re-location at Parsons, and at latest, when on the 10th of July it declared the county-seat to be at Parsons, and a particular building there to be the court-house, Parsons became the county-seat, and St. George ceased to be, and the functions of the County Court touching the re-location were at an end. It had fully exercised its jurisdiction. It had only to re-

move the records from a place, which was no longer the county-seat, to one that had taken its place. Do you think that after all this a Circuit or County Court could lawfully sit at St. George? I do not.

Just here I will say that the order of restoration was made at St. George, as the notice for the special term shows. Our Code (section 6, c. 114) requires Circuit and County Courts to sit at the court-house. Judicial proceedings at a place not appointed by law are null and void, because the court there sitting is not a court but usurps jurisdiction, especially as our Code c. 39, s. 6 requires the County Court to sit at the court-house. 1 Black, Judgm. § 177. It seems to me that this also is a reason why a writ of prohibition should issue.

How are we to regard the County Court's order of the 7th of August? If as an attempt to restore the county-seat to St. George, it was was without jurisdiction. If as a recognition of St. George as still the county-seat, it was without jurisdiction, since it had no such matter to deal with, because for reasons just stated St. George had ceased to be, and Parsons had fully become the county-seat. In such light, as based on the theory that St. George was yet the county-seat, we must regard this order; and as such it was without jurisdiction, If we are to regard the order as not touching the county-seat, but as dealing only with the records and papers pertaining to the courts, then we find the County Court, not because of war or other emergency, removing such records from the lawful county-seat and court-house, where the law commanded them to be kept, where the clerks were compelled under their bonds to keep and preserve them, without any circumstances calling upon them in law to make such removal, removing not only County Court records, but Circuit Court records—all the records—without authority or jurisdiction.

On the 7th of August these records were at Parsons, removed thither by Poling Bros. under their contract to remove them. No matter now that they were removed before the date fixed for their removal. The substance of the order of 10th of July was to make the removal. The appointment of a day for removal was only directory, and,

though the removal was before the date fixed, that did not make the act of removal after it had been done a nullity. On the 7th of August (the very day fixed by the court for removal) they were as a matter of fact at Parsons, and on that same day the County Court orders them restored to St. George in the face of its order to remove them to Parsons—the one order being just what the statute commanded, and now fully executed by its chosen agent; the other utterly without lawful authority.

The award of the writ of error to the order of the judge of the Circuit Court refusing a *certiorari* could not justify the order of the County Court. The bond to perfect the writ of error and the process had not been given or issued, when the records reached Parsons; and, moreover, it was a writ of error and *supersedeas* to an order of the circuit judge refusing the writ of *certiorari*. Its only effect likely would be to determine, whether the circuit judge had erred in refusing the *certiorari*, and, if he had, the order of this Court upon the writ of error would be, not even then to award the *certiorari*, but to remand the case to the Circuit Court, with mandate to it to award the writ of *certiorari;* and then, and not till then, would the record of the County Court's action touching the election be removed from it so as to determine whether there was error therein, since this Court upon the writ of error acts only on the petition for the writ of *certiorari.* This will appear from the action and opinions in *Chenowith* v. *Commissioners*, 26 W. Va. 230, and *Welch* v. *County Court*, 29 W. Va. 63 (1 S. E. Rep. 337). An injunction might lie to restrain the execution of orders against which *certiorari* is sought until a decision determining whether it should issue or not.

Another decisive reason for holding the order of the County Court restoring the records to St. George void for want of jurisdiction lies in the fact, that it was made at a special term, and the record of its proceedings does not show the purpose for which the special term was called. *Mayer* v. *Adams*, 27 W. Va. 244, holds that, to give a special session of the county court any jurisdiction in any matter, it must appear, not only that notice of it was posted, but "it must also appear from such entry on its

record-book what were the purposes for which the special session was to be held as stated in said notice, and that, if such entry is not made in the record-book, everything done at such special session must be held an absolute nullity," for want of jurisdiction, because jurisdictional facts in courts of limited and special jurisdiction must appear on its record.

Another reason justifying a prohibition, as it seems to me, is this: The order of 10th of July, directing the removal of the records, was executed on 1st of August. It had worked its legal effect. The records were at Parsons on the 4th of August, when the writ of error and *supersedeas* took effect; and, if that writ could restrain the execution of the County Court's orders, it could not reverse the act or removal already done; and a writ of prohibition ought to go to maintain the status existing at the time when the writ of error and *supersedeas* took effect until a decision of that writ should be had. For these reasons I think the petition shows ground for a writ of prohibition.

The answer relies on the fact that the order of 10th July was not an unconditional order declaring Parsons and the building there the county-seat and court-house, but contained a proviso that, if the building should not be completed by the date fixed by it for removal of the records, the order should be void, and on the fact that the building was not then completed. So far as concerns the county-seat, Parsons had before this become such. The statute required the court to declare it the county-seat, and no more, and it could not add a condition. So far as it concerns the records, we know that they were removed and placed in that building. The building was then partly completed. The defendants show that fact. How far incomplete we do not know. Would the want of a door or shelf justify the removal of the records from it? Surely not. Even the condition in the order of 10th of July would not be construed to mean that. It can not be that a building of brick or stone or any completed building must exist before a re-location can be voted by the people, or their vote be carried into execution by a removal of the records. Must they build beforehand? To provide a suitable place for

the courts and records is a matter for future provision by the County Court under other statute provisions.

Section 14, c. 39, Code, commands the County Court to provide at the county-seat suitable court-house, jail and offices for clerks, and the clerks are to keep the records and papers in such offices, as provided by section 9. By what right could the court move these records eight miles away from the county-seat? Mere insufficiency of the court-house would not justify it, for the statute provides a remedy for that, not by removal of the records miles away, but by providing a sufficient building; and an answer to this ground for removal of the records back to St George lies in the fact that, in its order of 10th July, the County Court declared that it appeared to the court from inspection and otherwise that the buildings at Parsons tendered to the county were adequate and sufficient for the purpose of clerks' offices for the records of the County and Circuit Courts and all other public purposes for which a court-house is directed by statute to be used. The restoration was not based on that ground, but on the theory that, pending the writ of error, St. George was the county-seat, or that the removal was premature.

The answer makes the point that the petitioners are in contempt of this Court, because, after a judge of this Court had awarded a writ of error and *supersedeas* to the order of the circuit judge refusing a writ of *certiorari* to the action of the County Court declaring the result of the election in favor of Parsons, said petitioners, in disregard of said writ of error and *supersedeas*, removed said records from St. George, and that being in contempt they can not be heard in this case. We regard the points untenable, (1) because the *supersedeas* was simply to a negative order of the circuit judge refusing a writ of *certiorari*, and, for reasons above stated, probably did not of itself operate as a *supersedeas* to the County Court orders, like a *supersedeas* accompanying a writ of *certiorari* under Code, c. 110, s. 6; (2) because process and bond were not issued and given until after the removal, and thus the writ had not become operative; (3) because, if it be law that in a direct proceeding for contempt the party will not be heard until he purges himself of con-

tempt, certainly the party would not be precluded from prosecuting a separate civil proceeding like this proceeding. Would he be denied all remedial civil process?

It is argued that as the County Court has jurisdiction of the matter of the re-location of a county-seat, a prohibition ought not issue, as that lies only where a tribunal is acting without jurisdiction. It is true that a County Court has jurisdiction and power over this subject for certain purposes limited and originated by the statute; but for reasons above stated it was acting without any jurisdiction, and besides, conceding its jurisdiction, it was exceeding its legitimate powers and abusing its jurisdiction, which statute and common-law make a ground of prohibition (Code 1891, s. 1, c. 110; *McConiha* v. *Guthrie*, 21 W. Va., 134).

It is urged in argument that petitioners are merely citizens and tax-payers and have no such interest as entitles them to ask this prohibition; and we are referred to *County Court* v. *Boreman*, 34 W. Va. 87 (11 S. E. Rep. 747). That was a proceeding to alter a road. In this case, who would interfere to prevent the improper removal of the county-seat or records but citizens and tax-payers? It concerned public interest, and affected them as citizens and tax-payers. Cases in this Court will show that citizens and tax-payers have such interest as will authorize them to sue touching the location of a county-seat. In *Welch* v. *County Court*, 29 W. Va. 63 (1 S. E. Rep. 337) they were allowed to prosecute a *certiorari* to orders of a County Court in a matter of re-location of the county-seat. True, they had appeared in the County Court; but, if they had no interest, they could neither appear nor have a *certiorari*. So in *Poteet* v. *Commissioners*, 30 W. Va. 58 (3 S. E. Rep. 97) tax-payers and voters were allowed to appear, and contest validity of returns of an election touching the county-seat and have remedial process as such. In *Armstrong* v. *County Court*, 15 W. Va. 190, citizens and tax-payers were allowed prohibition against the action of a county reducing taxes on a railroad.

We conclude that the answer presents no matter to discharge the rule. For these reasons the rule is made absolute; and the writ of prohibition is awarded.