# CHARLESTON.

## DAVIS *et al. v.* BROWN.

Submitted September 9, 1899—Decided November 11, 1899.

1. COUNTY SEAT—*Relocation—Elections.*

  In a vote, at a general election for public officers, upon the relocation of a county seat, under chapter 31, Acts 1895, requiring for relocation "three-fifths of all the votes cast at said election upon the question," such relocation is carried if it receive only three-fifths of all the votes cast on that one question, though they are less than three-fifths of the votes cast on some other question, or for candidates for office. (p. 718).

2. PLEADING—*Defenses not Raised Below.*

  Where an action or proceeding calls for pleadings in bar, all defenses must be presented before trial on the issues made up; and in informal proceedings without pleadings all defenses must be presented during the trial before judgment, and a party cannot reserve right to present others so as, in an appellate court, to have right upon reversal to demand that the case be remanded to the lower court to let in defenses not presented during the trial or hearing. (p. 724).

Error to Circuit Court, Randolph County.

*Certiorari* by John T. Davis and others against the County Court of Randolph County, T. P. R. Brown, and others. From a judgment of the circuit court, Brown brings error.

*Affirmed.*

FLICK, WESTENHAVER & NOLL, STRADER & STRADER, and E. A. CUNNINGHAM, for plaintiff in error.

C. WOOD DAILEY, for defendants in error.

BRANNON, JUDGE:

This case involves the change of the county seat of Randolph County. It was once before this Court upon the question whether the returns of an election upon the question of the removal of the county seat from Beverly to Elkins should be canvassed by the board of canvassers or the county court. 45 W. Va. 827, (32 S. E. 165), This Court decided that the county court should canvass the returns, and hear evidence of fraud and illegality in the election, and declare the result. When the county court proceeded to do this, it was found that at the general election held for public officers, as well as upon the question of relocation of the county seat, there were cast in favor of relocation at Elkins two thousand, one hundred and forty-five votes and one thousand, three hundred and twenty votes against it, and that three hundred and twelve ballots were cast which were not marked, or so marked as not to indicate the voters' choice; and the county court held that those three hundred and twelve, though not countable for or against either place competing for the county seat, must yet be counted as votes in ascertaining the aggregate vote, and that, as by their inclusion in that aggregate, Elkins had not received three-fifths, no removal of the county seat had been effected by the election. Then John T. Davis, W. T. Wilson, and O. H. Scott obtained from the circuit court of Randolph a writ of certiorari to review such decision of the county court, and the circuit court, being of opinion that said three hundred and twelve ballots could not be considered in making up the aggregate vote, reversed the action of the county court. The representative of Beverly, T. P. R. Brown, then moved the circuit court to send the case back to the county court to hear evidence of fraud and il-

legality in the election, or retain the case in that court and hear such evidence; but the court refused to do so, and declared that a sufficient number of votes had been cast in favor of Elkins to relocate the county seat there, and declared that Elkins should be the county seat thereafter. From this judgment of the circuit court Brown has obtained the writ of error now in hand.

Must the three hundred and twelve votes, though not countable for either Beverly or Elkins, be counted in fixing the aggregate? There are very many decisions bearing on this question, and they conflict. That great and late work, the American & English Encyclopedia of Law (2d Ed., vol. 10, p. 754), thus states the law: "When the law requires, for the election of an officer or the carrying of a measure, a vote of a majority, or a specified proportion of the legal or qualified voters, it is generally considered sufficient if the required proportion of the votes actually cast is in favor of the candidate or measure, and there is no necessity for any inquiry as to the actual number of voters in the district; for it is presumed that all legal electors voted, or, if they did not, that they acquiesced in the action of those who did. It would seem that an application of the same principle would lead to the conclusion that, where a measure is submitted to the voters at a general election, or at the same time as other measures, it should be considered carried if a majority, or the required proportion, of the votes actually cast for or against such measure are in the affirmative; and there are cases supporting this view. But the great weight of authority is otherwise, and supports the view that, in order to pass a measure, it must have the actual affirmative vote of a majority, or the required proportion, of those who participate in the election." I think this statement correct, properly applied to the facts which it presupposes to exist. Where voters do not come to the polls at all, they need not be inquired after; they do not exist, no matter how many there may be. This is so though the law require the assent of a majority of the voters of a county or district to elect an officer or approve a measure. "All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. Any other rule

would be productive of the greatest inconvenience, and ought not to be adopted, unless the legislative will to that effect be clearly expressed." So says the opinion in *Cass Co.* v. *Johnson*, 95 U. S. 369, 24 L. Ed. 416. Likewise, *Carroll Co.* v. *Smith*, 111 U. S. 556, 4 Sup. Ct. 539, 28 L. Ed. 517; McCrary, Elect. section 208; *Louisville & N. R. Co.* v. *Davidson County Court*, 62 Am. Dec. 424, and note 456. This is settled by many authorities. But that is not the exact question in this case. In this case three hundred and twelve voters actually came to the polls and participated in the election by voting for congressman and other officers, but did not vote upon the county seat question, and thus we know by the record of the election, without extrinsic evidence, that these voters exist. The ballots had on them, as required by chapter 31, Acts 1895, the words "For Relocation of County Seat at Elkins," and "Against Relocation of County Seat," and these voters either did not erase one and retain the other expression, or so marked their ballots touching this question as not with legal certainty to express a choice. The record does not show what number were defective for this cause, what number for that. Now, if our statute had said that a relocation should demand three-fifths of the "voters" or "qualified voters of the county," or "of the votes cast," or even "of the votes cast for the purpose," perhaps the weight of authority would say that those three hundred and twelve votes must be included in making up the aggregate dividend to be fractioned to get the three-fifths, though, as the above quotation from the Encyclopedia says, the fact that absent voters are not counted would seem to lead to the conclusion that those present, but not voting on this question, should not be counted. Most respectable authorities hold that, in the case supposed, they should be counted: *People* v. *Town of Berkeley*, (Cal.) 36 Pac. 591, 23 L. R. A. 838 (where the constitution required "a majority of electors voting at a general election"); *Belknap* v. *City of Louisville*, (Ky.) 36 S. W. 1118, 34 L. R. A. 256 (constitution requiring "two-thirds of the voters thereof [city] voting at an election to be held for that purpose"); *State* v. *Foraker*, (Ohio) 23 N. E. 491, 6 L. R. A. 422 ("majority of electors voting at such election" on a constitutional amendment); *People* v. *Wiant*, 48 Ill. 263 ("majority of voters of a county" to remove a county

seat); *State* v. *Swift*, 69 Ind. 505, ("majority of electors of the state"); *State* v. *Winklemeier*, 35 Mo. 103 ("majority of legal voters of respective cities" to sell liquor on Sunday); *Everett* v. *Smith*, 22 Minn. 53 ("majority of electors of county" on a question). Equally respectable cases hold that they should not be counted: *Walker* v. *Oswald*, 68 Md. 146, 11 Atl. 711 (under statute requiring "a majority of the voters of said county" as to license); *People* v. *Clute*, 50 N. Y. 451 (Judge Folger saying: "Those of them who are absent from the polls in theory and practical results are assumed to assent to the action of those who go to the polls, and those who go to the polls and do not vote for any candidate are bound by the result of the action of those who do"); *Oldknow* v. *Wainwright*, 2 Burrows, 1017 where the whole of the council were 25, and 21 present, only 9 voted for the candidate, and the balance protested against an election then, Lord Mansfield said, "Whenever electors are present and don't vote, they virtually acquiesce in the election made by those who do"); *Rushville Gas Co.* v. *City of Rushville*, (Ind. Sup.) 23 N. E. 72, 6 L. R. A. 315 (where half the members of town council refused to vote, all present, and a majority of a quorum vote for a measure); *Booker* v. *Young*, 12 Grat. 303 (same); *Board* v. *Winkley*, 29 Kan. 36 (act requiring "majority of the votes"; held that majority of those cast on the bounty question was sufficient, though not a majority of votes for district officers); *State* v. *Langlie*, (N. D.) 67 N. W. 958, 32 L. R. A. 723 (act required for removal of county seat "two-thirds of all polled for any purpose, but two-thirds of those cast on the particular question, to approve the removal). These cases are given for reference. They show that, where the law requires a majority or given portion of votes cast, there is conflict whether this means a majority of those voting on the particular question, or of all those—the highest number—upon any other question, or between candidates for office. One theory is that, when a majority of qualified voters is required, and we know from the election record that a certain number of voters were present, participating in the election, we should require a majority of all to adopt the measure. The other theory is that those present, but not voting on the question, are dumb upon it, without active preference, without choice, assenting to what those

who do speak shall do, like those who do not at all approach the polls; even more so, because present and silent.

We do not, because we need not, decide which of these theories is right. We decide this case on the particular language of our statute, which says that, "if three-fifths of all votes cast at said election upon the question be in favor of the relocation," such relocation shall take place. Now, we are asked to strike out the words, "upon the question." This would violate the legislative design. It has isolated and specialized this particular election from the election for other purposes; made it, in effect, a special election for that alone. It has made it just the same as one between two candidates for office. Beverly and Elkins were simply two candidates for the choice of those who chose to vote between them. The Encyclopedia, above quoted, while supporting the view that those not voting count in the aggregate, admits in its note under the head of "Decisions Under Special Provisions Modifying the Rule" that such a special provision as ours modifies the rule. In the strongest case cited for Beverly—the Kentucky case of *Belknap* v. *City of Louisvitle*, *supra*—it is admitted that such a special provision changes the rule, and that under it a majority of votes cast for and against will be enough to carry a proposition. The case of *State* v. *Foraker*, 46 Ohio St. 677, (6 L. R. A. 422), is very strong for this position, because, while holding that, where the requirement for adoption of a proposition is "a majority of electors voting at such election," it requires a majority of all voting for any officers, yet, under another clause, saying that a constitutional amendment must be submitted "to the electors of the state, and adopted by a majority of those voting thereon," the court admits the rule would be different, saying that the latter is "explicit and clear," to convey a different meaning from that of the former. While in *State* v. *Anderson*, 26 Neb. 517, (42 N. W. 421), it is decided that, where the statute required for the sale of public grounds "two-thirds of the votes cast," there must be two-thirds of all the voters participating for any purpose in the election, yet in *State* v. *Cornell,* (Neb.) 74 N. W. 59, (39 L. R. A. 513), it is held that a vote of two-thirds of votes cast on the question of a bond issue was sufficient, though not two-thirds

of the voters taking part in other matters in the election, as the statute required two-thirds "of the votes cast on such proposition." In *Armour Bros. Banking Co,* v. *Board of Com'rs of Finney Co.* (C. C.) 41 Fed. 321, a Kansas statute touching purchase of a farm for the poor authorized a tax for the purpose if the question should be submitted at a general election "and a majority of all the votes cast, at a poll open for that purpose, shall be in favor of such assessment." The United States circuit court held that a majority of the votes cast on the question carried the tax, and it did not require a majority of all voters voting on other matters. The constitution prohibited county indebtedness "without the assent of two thirds of the qualified voters voting at an election to be held for that purpose," and it was held that it only required two-thirds of such electors as vote on the proposition of incurring the indebtedness and not two-thirds of all who vote at the election, though a general election. *Howland* v. *Board*, 109 Cal. 152, (41 Pac. 864). In *Gillespie* v. *Palmer*, 20 Wis. 544, the constitution provided at a general election "by a majority of all votes cast at such election," and the court held in elaborate opinions that the proposed addition to suffrage was carried by "a majority of votes cast upon that subject," though not a majority voting for candidates. The case emphasizes the position taken in this opinion—the pivot of this case—that, where the law only requires a "majority of those voting thereon," or "on the question," or the like, votes as to candidates are utterly irrelevant. This case is approved in *Sanford* v. *Prentice*, 28 Wis. 358, though that case involved absent voters, not those voting on other subjects; but the general ground is held that those who do not speak on a proposition are nonexistent as to it. The proposition that a voter who comes to the polls, but does not vote on a question, is the same as if he voted nay, is not tenable. If so, why provide for any negative vote? Why so prepare the ticket at a general election as the act of 1895 does?

There is another consideration material on this point. The act of 1895 provides, as to a county seat election, that "the said votes shall be taken, superintended and returned in the same manner and by the same officers as elections for county and state officers." Can the precinct officers

count and "return" as votes ballots having neither the yea nor nay vote on a county seat erased? I think not. By Acts 1893, p. 72, if two or more ballots contain different names for the same office, they count not, but are to be destroyed by the precinct officers, and any ballot from which it cannot be told what is the voter's choice shall not be counted. So as to those with more names than they should contain for any office. Now, as the act of 1895 assimilates a county seat election to an election for officers, such ballots in a county seat election cannot be counted, because, neither "for" nor "against" being erased, they are like a ballot with the names of two different candidates. The law excludes ballots with two different names for the same office; so it would exclude those having both "for" and "against" removal. The precinct officers are forbidden to count them. Yet they count in the final make-up, under the contention made for Beverly. By this contention a voter, though ever so minded not to vote on the county seat question, could not help so doing; for, if he erased from his ballot both "for" and "against" relocation, or erased neither, he would count as a negative or dissenter against relocation. Those three hundred and twelve ballots were deposited. What they are as to this question a quotation from the able counsel for Elkins will answer: "While the terms 'ballot' and 'vote' are cometimes confused, and while they may sometimes be used synonymously, the ballot is, in fact, under our form of voting, the instrument by which the voter expresses his choice between two candidates or two propositions; and his vote is his choice or election between the two, as expressed by his ballot; and when his ballot makes no choice between any two candidates, or on any question, then he casts no vote for either of these candidates or on the question." Those ballots are not votes. Neither are those who cast them voters or votes in this matter. A voter is not a vote, absent or present and not voting on the particular matter; surely not under the act of 1895. I confess that I have written too much on this point. I excuse myself only because it is made a test question in a very important case by very able briefs of counsel on both sides, and because the matter has not been before discussed in our Reports, and the decisions referred

to are not generally accessible through the State, and I
have made reference to them for that reason.

. Another subject: The county court canvassed the re-
turns, and recounted ballots, not counting for either El-
kins or Beverly the three hundred and twelve defective
ballots, because not marked, or so marked as not to indi-
cate the choice of the voters; and entered the result, which
gave Elkins the requisite vote. Then Brown, after an-
nouncing that he did not waive, but reserved, the right to
give evidence to show fraud and illegality in the election,
if the court should decide his motion against him, moved
the court to declare that said three hundred and twelve
ballots should be included as part of the total vote on the
question of relocation, making the total vote three thous-
and, seven hundred and seventy-seven, and that, as only
two thousand, one hundred and forty-five were for reloca-
tion, the county seat had not been relocated; and the court
sustained the motion, and entered the judgment that no
relocation had been accomplished by the election. In the
circuit court the parties submitted the case on the certio-
rari on its merits as shown by the record, and the court
entered judgment reversing that of the county court, and
from the record declared that relocation had received two
thousand, one hundred and forty-five votes out of a total of
three thousand, four hundred and sixty-five cast, and
against relocation one thousand, three hundred and twenty,
and declared that the county seat had been relocated at
Elkins, and that thereafter Elkins should be the county
seat. The next day Brown moved the court to set aside its
judgment, and remand the case to the county court, to hear
evidence of fraud in the election, or retain it in the circuit
court for that purpose; but the court refused. The ques-
tion, then, is, did the circuit court err in refusing to re-
mand the case to allow a further trial to hear such evidence,
or hear it itself, and in entering such final judgment? I
confess that I have been inclined to answer this question
in the affirmative, only because it might seem that Brown
should have the opportunity to offer such evidence as he
may have; but I have reached the conclusion that this ac-
tion of the circuit court is correct. Take an ordinary ac-
tion. The defendant has half a dozen different defenses.
He files a plea of one only, and that is bad because it pre-

sents no good bar to the action, just as Brown's motion pre-
sented no defense against a judgment in favor of Elkins.
A jury finds for the defendant on the bad plea. The plain-
tiff moves the court—as he may—to enter judgment *non
obstante veredicto*. The court should do so, because that
plea—that defense—is bad. Suppose, however, the court
refuses to give judgment, and gives judgment for defend-
ant, and the case is appealed, and the appellate court, hold-
ing the plea bad, should do what the trial court should
have done—give judgment for the plaintiff *non obstante
veredicto*. *Mason* v. *Bridge Co.*, 28 W. Va. 645; *William-
son* v. *Cline*, 40 W. Va. 206, (20 S. E. 917). Who would
think of asking the court to remand the case for another
plea? The case just put makes no mention of a reserva-
tion by the party filing the bad defense. Does it change
the result that, when he files such plea, he reserves the
right, should he lose on that plea, to file another? I think
not. If he could reserve it effectually in the trial court,
so far that, if that court should rule out his plea, he may
file another before trial, which likely is the case, yet if
there is a verdict on it for him, and the court is asked by
plaintiff for judgment notwithstanding the verdict, I do
not think he could then avert such judgment by filing an-
other defense. The common law compelled a defendant
to select one defense only, and abide by it, win or lose; but
our statute allows several pleas of several defenses, and
defendant must file all before trial. He cannot try the
case piece-meal, keeping his adversary in court at great
cost, protracting litigation to the detriment of his adver-
sary and the public. The court cannot give him leave to
so proceed. He must be taken to know the law, and antic-
ipate final decision against his motion. He waives the
right to file other pleas. He takes the risk, as he would
have done at common law, when only one defense of fact
was admitted. If this is so in the trial court after trial,
more so it is in case the defendant gets judgment there,
and the plaintiff carries it up, and the appellate court holds
the plea bad. It enters judgment *non obstante veredicto*.
Can it be that it can be asked to remand the case to the
trial court for another defense to be put in, and another
verdict on a bad plea, and another appeal, and another re-
mand, and so on until the half dozen defenses are separately

made, with a half dozen trials and appeals? This cannot be so. Brown risked his defense against relocation upon that motion to count those ballots, introducing no evidence of fraud in the election to defeat relocation, gained upon it in the county court, and cannot ask a remand to the county court for another trial on entirely new defenses; nor can he ask the circuit court to grant such new trial. That reservation was his own act, not the court's. The court might have warned him against it, but was not bound to do so; and its failure to do so rendered it no less his risk as to Davis' rights. Davis did not consent to it. Though the proceeding in the county court be not a formal action, with formal pleading, it must be assimilated to an action for such purpose as this. The case is likely stronger towards this view, where the court tries all matters of law and fact,—the whole case. It decides all, gives final decision, without new trial. When a court has law and fact before it on demurrer to evidence, it enters final judgment, and gives no new trial, and when in an appellate court on such demurrer it gives final judgment. If this case be likened to a repleader, a repleader will not be given him who commits the first fault in pleading. *Kirtley* v. *Deck*, 3 Hen. & M. 388; 2 Tucker, Comm. 313.

It is argued that the circuit court could only reverse the county court, overrule the motion of Brown, and remand, and go not further, because an appellate court does not pass on matters never passed on by the trial court; and we are cited to such cases as *Kesler* v. *Lapham*, 46 W. Va. 293, (33 S. E. 289), and others there cited. But that is not the exact question here. There are a few instances where the court below failed to pass on matters in the record,— never passed any opinion upon them; and the appellate Court will not decide them, as it sits only to correct erroneous action, not nonaction. But there is nothing in this record on which the county court has not acted. The whole case as presented was before it and the circuit court, sufficient to give judgment. The circuit court was asked to assume that Brown had evidence of fraud, and open the case for its admission. That on which the court did not act is outside the case, and may or may not exist so as to affect the case, and does not fall under those cases. They

will not warrant an appellate court, upon reversal, to stay judgment final to let in new defenses.

It is also argued that the rule in this case is the same as that applying where a demurrer is sustained to a bill in equity; that it is error to decree without giving leave to amend; and *Norris* v. *Lemen*, 28 W. Va. 336, is cited. That case reflects the tenderness of courts of equity in the amendment of pleading. It does not apply in this case. There is no pleading or matter in the case already which is asked to be amended, but a new case is sought to be introduced. Furthermore, that case says that it is only when it is apparent from the bill that "it can be amended so as to show a cause for relief" that leave to amend should be given in the appellate court; whereas we know not that anything can be shown to make a case in favor of Brown, save only that reservation attending his said motion. How did the circuit court know that any evidence of fraud material to demand different judgment existed? A new trial cannot be had without showing that some new matter, not known to the party, exists, and of so material a character as to call for a different verdict. But here an appellate court is asked to reopen the case without anything material shown to exist, and for matters, if existent, well known to the party at the trial. I instance the rule as to new trials only to show that much less could the circuit court be asked to reopen the case. But I think that court could not have reopened it even if such showing had been made. It is said the law gives the county court the jurisdiction to determine the result of a vote as to a county seat. So it does. The Randolph court has exercised that function, and it is now a question upon an appellate process—certiorari— whether it erred, and on that writ the court reviews the whole case as presented in the record. The circuit court acted only under its appellate power, and, as incidental to it, gave final decision on showing of the record, and declared that relocation at Elkins had been adopted; and this was logically its proper judgment. The mere declaration of the votes for and against relocation operates as a relocation or its failure, without any declaration that a particular place shall thereafter be the county seat; and the addition of this declaration is only a legal sequence of the declaration of the result, and, while not necessary,

it is a proper, prudent clause within the jurisdiction and function of the circuit court. *Hamilton* v. *Tucker County Court*, 38 W. Va. 74, (18 S. E. 8). It was not proper to remand to the county court to make such declaration. Code 1891, page 761. These views lead to the affirmance of the circuit court judgment, and it is so ordered.

*Affirmed.*