STATE OF WEST VIRGINIA

*v.*

DEWAIN HARRY BURFORD, *Alias* D. H. BESS

(No. 10387)

Submitted October 2, 1951. Decided December 4, 1951.

*J. Raymond Gordon,* for plaintiff in error.

*Thomas P. O'Brien, W. F. Keefer* and *W. Bryan Spillers,* Assistant Attorney General, for defendant in error.

GIVEN, JUDGE:

Defendant, Dewain Harry Burford, was indicted by a grand jury of the Intermediate Court of Ohio County, at

the February, 1950, term. The indictment contained two counts. The first count charged "Robert Roy Taylor, alias Howard Fisher; Dewain Harry Burford, alias D. H. Bess; Lee Pullen; John Doe and Richard Roe", with breaking and entering Fisher's Dairy Bar in 1946, with intent to unlawfully and feloniously steal personal property of the value of $1,171.41. The dairy bar was situated in a building in Triadelphia, Ohio County. The second count charged defendants with entering the dairy bar without breaking, with felonious intent. A separate trial was awarded Burford and the jury returned a verdict of guilty as to the charge contained in the first count. The jury, before commencing its deliberations, were instructed by the trial court not to consider the charge contained in the second count. Upon the verdict of guilty the trial court, on August 7, 1950, entered its judgment, sentencing Burford to the state penitentiary. The Circuit Court of Ohio County granted a writ of error to the judgment of the trial court and, by order of February 14, 1951, affirmed that judgment.

The breaking and entering occurred on the morning of May 20, 1946, sometime after two A. M. Two employees of the dairy bar, about five-thiry A. M., discovered that the dairy bar had been broken into, and that the metal safe used for safekeeping of cash and valuable papers had been broken open. The breaking and entering were immediately reported by the employees to Louis Fisher, the proprietor of the dairy bar, and by him to members of the Department of Public Safety. Members of that department arrived at the scene of the crime shortly thereafter and initiated an investigation. It was found that the entry into the building had been made by breaking a pane of glass from a door in the rear of the building, that the safe had been broken open, and an amount of cash in excess of one thousand dollars taken therefrom. Paul Morris, the member of the Department of Public Safety in charge of the investigation, found on the knob of the safe red paint, and later delivered the knob to Sergeant Shanholtzer, of that department, Sergeant Shanholtzer being an experienced chemist. The knob was

identified at the trial as State's Exhibit No. 3. Trooper Morris also found that a portion of wood next to the broken pane of glass had been "bruised," and a part thereof was cut from the door and delivered to Sergeant Shanholtzer by Trooper Morris. The piece of wood cut from the door was identified at the trial as State's Exhibit No. 4.

A short distance, probably about six hundred feet, from the dairy bar there was located a tourist camp known as Camp Joy. Camp Joy, at the time of the breaking and entering, was operated by W. S. Bebout. On the evening of May 19, 1946, two men, suspected by the State as being Burford and Taylor, registered at Camp Joy. The first name to be signed on the register was "Howard Fisher", and the second name to be signed was "D. H. Bess". Following the name of Howard Fisher, across the page, a description of the automobile in which the two men were supposed to have arrived at Camp Joy was given. The make of the automobile, as written, appears to be "Chrys.", though it could be "Chev.". The manager of Camp Joy wrote the make of the car on the register. He testified that he was advised by one of the men who registered as to the make of the automobile and, when asked if he could tell the jury the make, answered: "Olds"— "Chevrolet". The license number 246035 was also written on the register by the manager of Camp Joy, and he testified that he observed the license number on the car "that was in camp". It is the contention of the State that the name "D. H. Bess" was written on the register by defendant Burford. The two pages from the register were identified as State's Exhibits Nos. 1 and 2, respectively. They were obtained from Bebout by Trooper Morris and were delivered by him to Sergeant R. I. Boone, of the Department of Public Safety, a person experienced in examining and comparing questioned writings.

On May 22, 1946, after the arrest of Lee Pullen, Trooper Lester searched the Chrysler automobile, bearing license number 246035, owned by Lee Pullen. The Chrysler was then at McCann's Garage in the City of Charles-

ton. There were found in the automobile "an eight pound rock hammer, painted red with the handle sawed off, a two pound blacksmith drawing hammer, one black crowbar or wrecking bar, two steel drills, one cold chisel, one quarter inch steel punch and three pairs of white canvas gloves with blue cuffs, and the usual automobile tools like the jack and tire tool and tire wrench." The eight pound rock hammer was identified as State's Exhibit No. 11. One of the white canvas gloves, with red substance on it, was identified as State's Exhibit No. 15. Exhibits 11 and 15 were delivered by Trooper Lester to Sergeant Shanholtzer.

About five forty-five P. M. of May 23, 1946, Trooper Lester arrested defendants Burford and Robert Roy Taylor. At the time of their arrest they were riding in a Lincoln Zephyr coupe, owned by Taylor, who was then driving. Upon search of the automobile two pairs of brown cloth gloves were found, one pair over the sun visor on the right, and one pair over the sun visor on the left, of the Lincoln Zephyr. One pair of gloves was identified as State's Exhibit No. 6 and the other pair as State's Exhibit No. 7. There was also found, in the trunk of the Lincoln, a hand axe with red paint on the striking part thereof. The axe was identified, at the time of the trial, as State's Exhibit No. 5. The gloves and axe were delivered by Trooper Lester to Sergeant Shanholtzer.

Van Brown, a police officer of the City of Charleston, testified that he was acquainted with Burford, Taylor and Pullen in May, 1946; that he knew the automobile then owned by Pullen and that he had, during the latter half of May, 1946, observed Burford, Taylor and Pullen riding together in the Chrysler automobile of Pullen, in or about the City of Charleston, probably a "dozen" times. Louis Fisher, the proprietor of the dairy bar, testified that on his way home after he had closed the dairy bar, about two o'clock of the morning of the breaking and entering, he observed Robert Roy Taylor in a Chrysler automobile, parked about five hundred feet from the dairy bar, but that he did not observe the license number then on the car, and he did not observe defendant Burford in the car.

Other evidence relating to the crime will be referred to in connection with the discussion of the particular question to which it is related.

On the fourteenth day of June, 1950, a jury was impaneled to try Burford. Before the introduction of any evidence the prosecuting attorney moved the court that the jury be taken to the scene of the alleged crime, also that the jury be taken to the home of W. S. Bebout, for the purpose of taking the testimony of Bebout. In support of the last mentioned motion an affidavit of the prosecuting attorney was filed showing the nature of the testimony expected to be given by Bebout; that he was ill and unable to attend court; and that the home of Bebuot was near the scene of the alleged crime, in Ohio County. Both motions were granted over objections of defendant Burford. The jury, in custody of the sheriff, together with the judge of the court, prosecuting attorney, defendant, and defendant's attorney, viewed the scene of the alleged crime and then were taken to the home of Bebout, where his testimony was taken, after which they returned to the court house of Ohio County, and adjourned for the day. On the morning of the fifteenth, upon reconvening of court, it was disclosed to the court "that during the preceding night the jury had been taken to a hotel in the City of Wheeling for lodging and, the hotel not having available a room adequate to care for the jury, the jury had been permitted to be separated, a part of the jury sleeping in a room on one floor of the hotel and a part on another floor of the hotel * * *." Whereupon the State, by the prosecuting attorney, moved for a mistrial, which motion was sustained and the jury was excused from further service, and trial of the case continued until the twenty-seventh day of June, 1950. The defendant timely objected to the granting of the motion, and excepted to the action of the court in sustaining the same, contending that any later trial would place defendant in jeopardy a second time.

The case was called for retrial on the twenty-seventh of June, 1950, and, after the impaneling of the jury, de-

fendant moved the court that he be discharged from custody, for the reason that he had been placed in jeopardy at the former trial, which motion was overruled and exception to the action of the court saved defendant. The State again moved the court that the jury be permitted to view the scene of the alleged crime and that the testimony of W. S. Bebout be taken at his home, supporting the motion with a new affidavit of the prosecuting attorney, similiar in effect to the affidavit mentioned above. Both motions were granted, over objections of defendant, and exceptions to the action of the court were saved defendant. The jury, in custody of the sheriff, were then taken to the scene of the alleged crime and, after the view, together with the trial judge, prosecuting attorney, court reporter, and defendant Burford and his counsel, were taken to the home of W. S. Bebout, outside of Wheeling and in Ohio County, several miles distant from the court house of Ohio County, where Bebout's testimony was received. The taking of the testimony was public, in so far as circumstances and facilities would permit.

. Defendant did not testify in his own behalf. The court reporter was sworn and testified to the effect that upon the former trial Trooper Morris had given testimony tending to show that State's Exhibits Nos. 1 and 2, the sheets from Camp Joy register, evinced erasures at the time they were received by him from Bebout. C. D. Burford, a brother of defendant, testified to the effect that at the previous trial, in the taking of the testimony of Bebout at his home, Bebout identified the brother as the person who signed the name "D. H. Bess" on the register of Camp Joy.

Defendant contends: (1) That at the trial commenced on the fourteenth day of June, 1950, defendant Burford was placed in jeopardy as to the offense charged, and could not thereafter be tried for the same offense; (2) that the writing upon State's Exhibits Nos. 1 and 2, sheets from the register of Camp Joy, before being offered as evidence, evinced erasures or alterations, and should not have been admitted as evidence; (3) that the action of

the trial court in taking evidence at a place other than the court house of Ohio County rendered the trial void; and (4) that the evidence was insufficient to support the verdict of guilty.

Was defendant twice put in jeopardy of life or liberty by the second trial? Our State Constitution, Article III, Section 5, provides that no person in any criminal case shall "be twice put in jeopardy of life or liberty for the same offense." The provision has been considered by this Court numerous times. In *State* v. *Shelton*, 116 W. Va. 75, 178 S. E. 633, during the trial the court was informed that there had been a separation of the jury, whereupon it declared a mistrial, withdrew a juror, discharged the others, and reset the case for trial the following week. When the case was recalled the plea of former jeopardy was interposed. The demurrer to the plea was sustained and, in Point 1 of the syllabus, this Court held: "In the trial of a criminal case the trial court, acting under Code, 62-3-7, may, for manifest necessity, discharge the jury and order a new trial. Such action will not afford basis for a plea of former jeopardy." The pertinent part of Code, 62-3-7, reads: "* * * in any criminal case the court may discharge the jury, when it appears that they cannot agree in a verdict, or that there is manifest necessity for such discharge." In the opinion in the *Shelton* case we find this language: "* * * Therefore, considering that there was an improper separation, had the defendant been placed in jeopardy, within the meaning of the constitutional provision (West Virginia Constitution, Article III, section 5) which prohibits the placing of a person twice in jeopardy for the same offense? Where the state has once placed a person in peril of life or liberty under accusation of a specific crime, such individual, protected by the constitutional guaranty, may never thereafter be put on trial for the same alleged offense, unless the jeopardy at the first trial was destroyed *ex necessitate*. This is elementary. But in application of the postulate difficulty arises in determining when there has actually been a 'jeopardy' within constitutional meaning. A former ac-

quittal on the merits is, of course, a bar to a second prose-cution. Code, 61-11-13.

"We have another statute, which has existed for many years, that authorizes a trial court to excuse a juror who becomes unable, from any cause, to continue in the discharge of his duty, and to substitute another in his place. Code, 62-3-7. This statute proceeds: 'And in any criminal case the court may discharge the jury, when it appears that they cannot agree in a verdict, or that there is manifest necessity for such discharge.' The portion of said statute dealing with the substitution of a juror has twice been before this Court. In *State* v. *Davis,* 31 W. Va. 390, 7 S. E. 24, there was upheld the action of the trial court in substituting in a felony trial a new juror for one whose son had died after the trial started. In *State* v. *Williams,* 49 W. Va. 220, 38 S. E. 495, a similar substitution was approved. Though the cause for the trial court's action was not disclosed by the record, this Court assumed that there was good cause.

"There seems to be no reported West Virginia case dealing with a situation like the one at bar, but the statute (quoted above) authorizes a judge presiding in a criminal case to discharge the jury where there is 'manifest necessity' therefor. Where the jury has been separated in such manner that a verdict of guilty could not be upheld, we conclude that there is *manifest necessity* to discharge the jury and begin again. That course will be considered to have terminated an unsubstantial and nugatory trial. When the jury is sworn in a criminal trial jeopardy attaches, but it may be destroyed. A fortuity in the trial may put an end to the jeopardy; the case will then stand as though no trial had been started. This determination is a result of necessity. Authorities differ in their lines of reasoning, but they reach the same conclusion. 1 Bishop on Crim. Law (9th Ed.), sec. 1036; II Wharton's Crim. Pro. (10th Ed.), sec. 1445."

We are of the opinion that the rule laid down in the *Shelton* case controls the instant case, and that the second trial of defendant did not constitute double jeopardy.

See *State* v. *Burke,* 130 W. Va. 64, 42 S. E. 2d 544; *State* v. *McLane,* 126 W. Va. 219, 27 S. E. 2d 604; *State* v. *Little,* 120 W. Va. 213, 197 S. E. 626; *State* v. *Runyon,* 100 W. Va. 647, 131 S. E. 466.

We see no merit in the contention of defendant that State's Exhibits Nos. 1 and 2 should not have been read to the jury. It is true that certain evidence tended to indicate that the writing on the exhibits had been changed or altered, but it is also true that there was properly admitted evidence tending to show that no erasures had been made and that the writings had not been changed or altered. The conflict thus created constituted a question for the jury and, in the consideration of that question, the State was entitled to have them examine the writings.

Was it error for the trial court to hold the session outside of the court house, several miles from the City of Wheeling, in Ohio County, for the purpose of taking testimony of the witness who was unable to appear at the court house because of illness? The Legislature, by Chapter 7, 1893 Acts, established "* * * a court of record of limited jurisdiction in the county of Ohio, to be called the criminal court of the county of Ohio." Section 11 of that act provides "For the exercise of the jurisdiction and power conferred by this act, six sessions of said court shall be held each year, * * * ". Section 12 of the act reads, in part: "The said six sessions shall be held at the court house of Ohio county, in the court room heretofore designated Part 2 of the circuit court, which is next to the county jail of Ohio county, * * *". By Chapter 120, Acts, 1925, the Legislature changed the name of the court to "The Intermediate Court of Ohio county". Section 11 of the last mentioned act reads: "The said terms of said court shall be held in Wheeling in said county of Ohio at the court house thereof".

Code, 51-3-7, reads: "Every circuit court, county court and other court of record of any county shall be held at the courthouse of such county, except where some other place is prescribed by law or lawfully appointed. When

the courthouse of a county is destroyed or is not in a condition to be occupied, such court shall hold its sessions at such places as may be appointed by order of the county court. A copy of such order or warrant shall be posted by the clerk of the county court at the front door of his office, at the courthouse door, unless the courthouse has been destroyed, and at the place so appointed." Section 8 of the same article authorizes the Governor of the State to appoint, by proclamation, a place different from that fixed by law for holding a court when certain emergencies exist. Section 9 of the same article requires that the place of any session of a court of record appointed pursuant to Sections 7 and 8 be within the county wherein such court is regularly held.

The question posed gives no little trouble. No authority has been cited, and we find none, deciding the question in this jurisdiction. Decisions in other States are helpful, when statutory provisions are similar. In *Commonwealth* v. *Scott*, 10 Gratt. 749, decided 1853, the Court considered a similar question. The Virginia statute then provided that the circuit court of any county should be held at the court house of such county except where some other place was prescribed by law or lawfully appointed. In the opinion it is stated: "This court, therefore, judicially knows that the judgment in this case was pronounced by that court sitting in the place prescribed by law, because the court could not legally sit in any other place. * * *." In *Hamilton* v. *County Court*, 38 W. Va. 71, 18 S. E. 8, the location of the county seat of Tucker County had been changed from St. George to Parsons by a vote of the citizens of that county. The results of the election effecting the change had been declared and entered of record. After the results of the election were recorded, and after a certain building at Parsons had been designated as the temporary court house of Tucker County, and after certain records had been removed thereto, the county court, sitting at St. George, entered an order directing the return of the records to St. George. In the opinion, written by Judge Brannon, it is stated: "* * * Do you think that after

all this a Circuit or County Court could lawfully sit at St. George? I do not.

"Just here I will say that the order of restoration was made at St. George, as the notice for the special term shows. Our Code (section 6, c. 114) requires Circuit and County Courts to sit at the court-house. Judicial proceedings at a place not appointed by law are null and void, because the court there sitting is not a court but usurps jurisdiction, especially as our Code, c. 39, s. 6 requires the County Court to sit at the court-house. 1 Black, Judgm. §177. It seems to me that this also is a reason why a writ of prohibition should issue." See *State* v. *Staley,* 45 W. Va. 792, 32 S. E. 198; *Caperton* v. *Bowyer,* 4 W. Va. 176. In *Johnston* v. *Hunter,* 50 W. Va. 52, 40 S. E. 448, Judge Poffenbarger, in the opinion, used this language: "* * *. 'To constitute a court, the judge or judges must be in the discharge of judicial duties at the time and in the place prescribed by law for the sitting of the court.' Works on Courts and their Jur. 1. 'The times and places at which courts shall sit are usually fixed by statute, and in order that a court may exercise its jurisdiction, these statutory provisions must be observed. The proceedings of a court at a time or place other than that prescribed by law are *coram non judice,* and, therefore, void. It is not only void; it is not the act of a court at all.' Works on Courts and their Jur. 81. * * *."

In *Mell* v. *Arkansas,* 133 Ark. 197, 202 S. W. 33, L. R. A. 1918D, 480, the Court held: "1. The court cannot, against the objection of accused, adjourn to an hotel to take the testimony of the prosecuting witness, who is too ill to appear in the court room." The statute controlling that decision required that the court be held at the "county seat". In the opinion, in remanding the case for a new trial, the Court used this language: "The court has recognized that in case of emergency, such as the destruction of the courthouse by fire, the court itself may secure other quarters in the county seat for temporary use in the administration of justice. *Hudspeth* v. *State,* 55 Ark. 323, 18 S. W. 183; *Lee* v. *State,* 56 Ark. 4, 19 S. W. 16. In the case

of *Williams* v. *Reutzel,* 60 Ark. 155, 29 S. W. 374, it is said that the object of the rule seems to be to obtain certainty and to prevent a failure of justice through the parties concerned or affected not knowing the place of holding court. The manifold mischiefs that might arise from permitting a court to assume a migratory character and travel from place to place in the same locality or even in the same town are manifest. It is apparent that courts are held to determine the rights of all who are properly brought before them, and that numerous cases are pending in the same court at the same time. It would detract from the majesty of the law, lessen the dignity of courts, and cause trouble and injustice to litigants if the courts should be held at any other time or place than that provided by law. * * *."

In *Harris* v. *State,* 72 Miss. 960, 18 So. 387, 33 L. R. A. 85, the applicable statute provided that meetings of the board of supervisors must be held at the court house. Action of the board at a meeting held in a building adjoining the court house was held void. In the L. R. A. note the author has correlated the decisions of numerous courts relating to the question. See also *Hamblin* v. *Superior Court,* 195 Calif. 364, 233 P. 337, 43 ALR 1509. We believe it unnecessary to review the decisions cited in the annotations.

We think the question in this State is controlled by the Acts of the Legislature quoted above. We find therein no authority, express or implied, authorizing the Intermediate Court of Ohio County to hold its sessions at any place other than the court house, "except where some other place is prescribed by law or lawfully appointed." No place other than the court house of Ohio County is prescribed by law for holding the sessions of that court. There is no contention that any other place was "appointed by order of the county court". The clear intent of the quoted acts, we believe, requires that all sessions of the Intermediate Court of Ohio County be held at the court house of the county, unless the "county court", not the "court of record", or the Governor has appointed another place for one or more of the reasons stated in the

statutes, and has given notice of the change, as required by the statute. The Legislature has consistently designated certain and definite places where the sessions of courts may be held. In the act creating the Criminal Court of Ohio County it required that the sessions of court be held in the definitely described room of the court house. The later act omitted any requirement as to a particular room, but required that the sessions be held "in Wheeling * * * at the courthouse." The statutes dealing with the place of holding sessions of courts of record are to the same general effect. Even in cases of emergency requiring, of necessity, that sessions of court be held at some place other than the court house, the Legislature has provided that the county court or the Governor shall designate the temporary place for holding the sessions.

While the statements from the *Scott, Hamilton* and *Johnston* cases may be considered dicta, we think they are in accord with the intent of the applicable statutes and express correct conclusions. They are also, we believe, in accord with the weight of authority. We conclude, therefore, that the action of the trial court in taking the testimony of Bebout at a place other than the court house of Ohio County, over the objection of defendant, constituted reversible error, at the least. We are not called upon to decide, and we do not decide, whether that action could have been waived by the defendant. We may point out, however, that jurisdiction of the court may be involved, should it hold its sessions in contravention of the express commands of the Legislature.

Inasmuch as there may be a new trial of defendant, we deem it necessary to consider the last assignment of error, that the evidence was not sufficient to support the verdict of guilty of the charge of breaking and entering. As indicated previously, the commission of the crime was definitely established. As to whether defendant Burford committed the crime or participated therein, however, depends upon circumstantial evidence. The circumstances proved by the State tending to connect defendant with the crime are not too numerous. It was shown that

Burford, Taylor and Pullen were observed together in a Chrysler automobile bearing license number 246035, a "dozen" times during the latter half of May, 1946, the month in which the crime was committed, in Charleston, where defendant resided, approximately one hundred and seventy-five miles from the point of the crime. Sergeant R. I. Boone, of the Department of Public Safety, a person experienced in examining and comparing handwritings, examined State's Exhibits Nos. 1 and 2, the sheets from Camp Joy register, and compared the writing of the name "D. H. Bess" thereon with known handwritings of defendant Burford. Sergeant Boone was definitely of the opinion that the name "D. H. Bess", appearing on the register, was written by defendant Burford. Therefore, in view of the finding of the jury, we may conclude that the State established that defendant Burford registered at Camp Joy, under the name of "D. H. Bess", for the night on which the crime was committed. Also, the jury was probably justified in finding that defendant Burford arrived at Camp Joy, in the Chrysler automobile, bearing license number 246035, with the person who registered at Camp Joy as Howard Fisher, from the fact that they registered at the same time and apparently used the same automobile license number in registering. We do not know, however, who the person registering as Howard Fisher was, or whether he was involved in the commission of the crime.

It may be recalled that red paint was found upon the knob of the safe, State's Exhibit No. 3, when it was recovered by Trooper Morris at the beginning of the investigation; that there was also red paint upon the striking surface of a hand axe, State's Exhibit No. 5, at the time it was found in the Lincoln Zephyr by Trooper Lester, three days after the commission of the crime; and that the eight pound rock hammer, State's Exhibit No. 11, found by Trooper Lester two days after the commission of the crime, in the Chrysler automobile, bearing license 246035, owned by Lee Pullen, was painted red. Sergeant Shanholtzer, an experienced chemist, examined, analyzed

and compared the red paint found on the three exhibits by means of a spectrograph and a spectroscope, and concluded that the paint on the three exhibits was composed of exactly the same chemical constituents. The film reflecting the result of the spectrographic examination of the paint found on the three exhibits was exhibited to the jury. From this testimony we believe the jury was justified in believing that the paint found upon the three exhibits was chemically the same, and that the axe and the rock hammer were used in the commission of the crime.

It may also be recalled that State's Exhibit No. 4, the block of wood cut from the door through which entry was made into the dairy bar, was delivered to Sergeant Shanholtzer, and that State's Exhibit No. 7, a pair of brown gloves found in the Lincoln Zephyr, was also delivered to Sergeant Shanholtzer. Spectrographic and spectroscopic examinations and analyses of the white paint found on the block of wood and on one of the gloves were also made by Sergeant Shanholtzer, who was definitely of the opinion that the paint found on the two exhibits was chemically the same. The film reflecting the result of the spectrographic examination of the paint found on these two exhibits was also exhibited to the jury. From this testimony the jury was probably justified in believing that some person connected with the crime was wearing the glove at the time he broke into or entered the dairy bar.

No evidence before the jury relating to the articles found in the Chrysler or Lincoln automobile, other than the ones upon which paint was found, tended to connect Burford with the crime. No circumstances other than the ones detailed were established by the State which tended to connect defendant Burford with the commission of the crime. Are the circumstances detailed sufficient to exclude every reasonable hypothesis of innocence?

In *State* v. *Kelly,* 105 W. Va. 124, 141 S. E. 633, this Court held: "When two inferences, equally plausible, may be drawn from evidence, the law does not permit the jury to adopt the one more unfavorable to the accused." In

*State* v. *Hunter,* 103 W. Va. 377, 137 S. E. 534, Point 2, syllabus, this Court held: "Where the evidence relied on to convict one of crime is in whole or in part circumstantial, the accused is entitled to an acquittal unless the fact of guilt is proven to the actual exclusion of every reasonable hypothesis of innocence." See *State* v. *Aliff,* 122 W. Va. 16, 7 S. E. 2d 27; *State* v. *Stutler,* 115 W. Va. 393, 176 S. E. 426; *State* v. *Wolfe,* 113 W.Va. 459, 168 S. E. 656; *State* v. *Johnson,* 104 W. Va. 586, 140 S. E. 532; *State* v. *Whitehead,* 104 W. Va. 545, 140 S. E. 531; *State* v. *Mininni,* 101 W. Va. 611, 133 S. E. 320; *State* v. *Gill,* 101 W. Va. 242, 132 S. E. 490; *State* v. *Beall,* 98 W. Va. 189, 126 S. E. 569; *State* v. *Dudley,* 96 W. Va. 481, 123 S. E. 241; *State* v. *Sheppard,* 49 W. Va. 582, 39 S. E. 676; *State* v. *Flanagan,* 26 W. Va. 116. "To convict on circumstantial evidence alone, it should to a moral certainty exclude every hypothesis but that of guilt; and circumstantial evidence should always be scanned with caution." Point 2, syllabus, *State* v. *Bennett,* 93 W. Va. 548, 117 S. E. 371. See *State* v. *McHenry,* 93 W. Va. 396, 117 S. E. 143; *State* v. *Gunnoe,* 74 W. Va. 741, 83 S. E. 64; *State* v. *Gebhart,* 70 W. Va. 232, 73 S. E. 964.

For the purpose of clarity we may summarize briefly the circumstances which may be presumed to have been established by the State tending to connect defendant Burford with the crime: During the latter half of the month in which the crime was committed defendant was often observed in the company of Taylor and Pullen, two of the defendants named in the indictment. Burford registered at Camp Joy under the name of "D. H. Bess", using the same automobile license number as that of the Chrysler automobile owned by Pullen. The constituent chemical elements of the red paint found on the safe knob, the hand axe and the eight pound rock hammer were exactly the same, and the constituent elements of the paint on the block of wood removed from the door from which the pane of glass was broken, and on one of the four gloves found in the Lincoln Zephyr, were exactly the same.

Do these circumstances point unerringly to the guilt of defendant Burford? When considered together, is every reasonable hypothesis excluded save that of guilt? We are forced to answer the questions in the negative. We assume that no one would contend that the presence of Burford at Camp Joy would in any way connect him with the commission of the crime. At most it would establish an opportunity for him to have committed the crime, or participated in its commission. But that can be said as to Taylor, who was observed in the Chrysler, and probably as to any guest registered at Camp Joy on the night on which the crime was committed. The evidence as to the paint on the several exhibits is just as impotent. Nowhere in the evidence is it even intimated that Burford owned, or ever had in his possession, any of the exhibits. He did not own either the Chrysler or the Lincoln Zephyr and, in so far as the evidence indicates, never had either of the automobiles in his possession. The most that can be said is that he was riding in the Lincoln, then being driven by Taylor, its owner, at the time the glove with the paint thereon was discovered. No evidence indicates that the Lincoln was in the vicinity of the dairy bar at the time of the breaking and entering. Neither is there any evidence as to how the gloves got into the Lincoln, or that Burford had anything to do with their being therein. Substantially the same facts exist as to the hand axe, except that it was found in the trunk of the Lincoln, not exposed to the view of a passenger in the automobile, as the glove probably would be. No evidence exists as to whether the crime was, or could have been, committed by only one person. If by one person was it Burford, Taylor, Pullen, or some unknown person? No answer can be made except on mere suspicion, and the suspicion appears to point to other persons as well as to the defendant Burford. Conviction of crime must not rest upon suspicion, however strong.

We think it unnecessary to discuss further the insufficiency of the circumstantial evidence to establish guilt. Enough has been said to indicate existing uncertainties,

creating reasonable doubt as to the guilt of Burford. Every hypothesis save that of guilt is not excluded, as required by numerous holdings of this Court. Numerous times this Court has pointed out the necessity for and merits of the circumstantial evidence rule, and, as well, the "reasonable doubt" rule, so that it is unnecessary to do so here.

The judgment of the Intermediate Court of Ohio County, sentencing the defendant, Harry Dewain Burford, to the penitentiary, and the order of the Circuit Court of that county affirming that judgment, are reversed, the verdict of the jury set aside, and the defendant awarded a new trial.

*Reversed;*
*verdict set aside;*
*new trial awarded.*