# CHARLESTON.

BROWN *v.* RANDOLPH COUNTY COURT.

Submitted December 14, 1898—Decided Feb. 4, 1899.

1. COUNTY SEAT ELECTION—*Contest.*

    A voter or taxpayer of a county may contest before the county court, for any legal cause, a vote upon the relocation of a county seat.  (p. 835).

2. COUNTY SEAT ELECTION—*Canvass of Vote—Board of Canvassers—County Court,*

    Returns of a vote on relocation of a county seat, taken at either a general or special election, must be canvassed, and the result declared by the county court, not by the board of convassers.  (p. 829).

3. STATUTES— Construction of Statutes.

In construing a statute which revises a former one, and the meaning of the former one was settled either by clear expressions in it or by adjudication upon it, mere change of phraseology will not be construed to be change of the law, unless it evidently purports an intention in the legislature to work a change. (p.834.)

Application by T. P. R. Brown for a writ of *Mandamus* against the Randolph County Court.

*Writ Granted.*

D. C. WESTENHAVER, E. A. CUNNINGHAM and L. D. & J. F. STRATER, for petitioner.

C. WOOD DAILEY and JOHN H. HOLT, for respondent.

BRANNON, JUDGE:

At the general election in November, 1898, the voters of Randolph County voted upon the question of the removal of its county seat from Beverly to Elkins, and when the commissioners of the county court met as a board of canvassers to canvass the returns of the election for Governor and other officers, C. H. Scott, John T. Davis, and W. G. Wilson, voters and taxpayers of the county, appeared before that board, and moved it to take up the certificates sent from the voting precincts as the vote upon the question, and declare the result; and T. P. R. Brown, a voter and taxpayer, objected, but the board overruled his objection, and proceeded to open the certificates, when Brown asked a recount of the ballots, and asked that he be allowed to go behind the returns apparent from the certificates, and offer evidence to set aside the election for fraud, and to exclude certain precincts for fraud. The matter having been postponed till the completion of the canvass as to the election as to officers, on a later day Brown objected to any canvass by the canvassers of the vote on the removal of the county seat, and asked that the certificates as to it be transferred to the county court, insisting that it alone had jurisdiction to ascertain and declare the result of this vote, and not the board of canvassers; while Scott and others insisted that the canvassers ascertain and declare the result from the certificates, without recount of ballots, and without going behind the certificates, and

hearing evidence of fraud in the election. The board de-
cided that it had jurisdiction to canvass the returns and
recount the ballots, but no further; and that, if asked then
to hear evidence upon the fairness and legality of the elec-
tion, it would transfer the controversy to the county court,
in order that that court might determine it and declare
the result. Both sides excepted to this action. When,
later, the county court met in regular session, Brown
asked it to take up the returns of the election upon this
question, and can vass them, recount ballots, and hear evi-
dence as to the fairness and validity of the election, and
ascertain and declare the result; but it refused. Brown
has obtained from this Court a *mandamus nisi*, and now
asks that a peremptory *mandamus* be awarded compelling
the county court to exercise jurisdiction, and take up the
returns, recount the ballots, hear evidence of fraud, and
ascertain and declare the result of the election. We must
determine whether this peremptory *mandamus* shall issue.
Scott, Davis, and Wilson, upon a *mandamus nisi* obtained
from this Court, and a poremptory *mandamus* to compel
the board of canvassers to simply declare the result of the
election from the certificates. We must determine
whether this *mandamus* shall issue. Brown also obtained
from this Court a rule against the board of canvassers to
show cause why a writ of prohibition shall not issue to
prohibit it from any proceedings touching the canvass of the
returns. We must decide whether this prohibition shall
issue. All these proceedings involve and turn upon the
same questions of law.

The sole question in this litigation is, which body shall
canvass the returns of a vote at a general election upon
the relocation of a county seat,—the county court as such
or the board of canvassers as such? Though these bodies
are composed of the same persons,—county commissioners,
—yet they are in law not the same, but distinct bodies.
The board of canvassers is merely a body to canvass the
returns of elections for public officers, acting simply on
the certificates sent from voting precincts by certain offi-
cers holding the election, and recounting ballots when de-
mand is made. They may send for those precinct officers
to ascertain the true result; but they hear no contests ju-
dicially, no evidence of fraud in the election. They act

ministerially only. If any candidate claims that the elec-
tion is fraudulent or in any wise illegal, or that ballots are
unlawfully counted against him, or not counted for him,
he must get relief by contest, as provided in the statute
*Brazie* v. *Commissioners*, 25 W. Va. 213. But a county
court, as such, canvassing the returns of an election upon
a vote upon a county-seat relocation, is an entirely differ-
ent tribunal, having wider function. It canvasses the re-
turns upon the certificates, can recount ballots, hear
evidence of fraud and illegality, and do what in the case of
candidates for office can be done by that court in hear-
ing a contest. *Poteet* v. *Commissioners*, 30 W. Va. 58, (3
S. E. 97). And that case, as also *Welch* v. *County Court*,
29 W. Va. 63, (1 S. E. 337), held that returns of elections on
a county seat must go before the county court to be can-
vassed, and to have the result declared, and not before the
board of canvassers. Such was the law under chapter 5,
section 15, Acts 1881 (Code 1887, c. 39, s. 15), as settled by
those two cases. But it is insisted by Scott and others
that all this has been changed by chapter 37, Acts 1895
(Code 1891, c. 39, s. 15). Scott contends that under this
act of 1895, the board of canvassers must canvass the re-
turns of such vote, if at a general election, simply by the
certificates sent from the precincts, and declare the result
of the vote; and that the county court has nothing to do
with such canvass and declaration. If the election is a
special one on the question, it is conceded that the county
court makes the canvass and declaration. I do not concur
in this position. If we look back through the entire life
of the State, we find under the Constitution of 1863 the
board of supervisors, and under that of 1872 the county
court, and under the amendment in 1879, of Art. VIII. the
county court, were given "superintendence and administra-
tion of the internal police and fiscal affairs of their coun-
ties." The location of a county seat falls under this head.
If we look at the legislation upon this subject in all this
time, we find that it gave the supervisors and the county
courts jurisdiction to entertain petitions for the removal
of the county seats, and to order votes thereon, and to as-
certain and declare their results. Acts passed in 1863,
1868, 1873, and 1881 show this. It was fit, under these
Constitutions, that the whole proceeding as to ordering

vote upon the question of removal of a county seat, ascertaining its result, and then providing a court house and other buildings at the new county seat, should be committed to the county court. It might be questioned whether this power could be given to other hands. It requires plain legislation, not merely doubtful construction, to revolutionize this policy, established so long. The act of 1891 is made to do so by implication only, the chief point to sustain such implication being the omission to provide, as former acts did, that the clerk should lay the returns of a general election before the county court. Let us look at the act.

The controlling reason for its enactment was to authorize, for the first time, a special election upon the relocation of a county seat. I see no other great change. Under it the petition for a vote on relocation must go to the county court. It alone could order a vote, and make all provisions necessary for it up to the election. How after the election? It says: "The said vote shall be taken, superintended, conducted and returned in the same manner and by the same officers as elections for county and state officers. If said election be held at a general election, the commissioners of election shall make out and sign a separate certificate of the result of said vote, and deliver the same to the clerk of the county court within the same time they are required by law to deliver the certificates of the result of the election of officers held by them. And if said election be held at a special election, then said county court shall at the session at which the election is ordered, appoint three commissioners of that election for each voting place in said county, who shall ascertain and certify the result of such election in the same manner as herein provided to be done at a general election. And the certificates of the result of such special election shall be laid before the court by the clerk thereof, at a special session thereof, which shall be held within five days (Sundays excepted) after said special election. Said court shall thereupon ascertain and declare the result of said vote and enter the same of record." Here we observe an aim at similarity of procedure in general and special elections, as far as possible. In words it requires the returns of a special election to go before the county court for canvass and declaration of result. Why

should it be different in the case of a general election? Is it because there are canvassers after a general election to canvass as to candidates, and none at a special election, and that convenience requires that they canvass as to both candidates and relocation? This idea is of slight force. The county court is in existence, and it makes no speed to have the canvassers act, as removal cannot occur until the county court orders it, as the act shows. This act requires separate certificates as to this election from those as to candidates. Why? Because they go for action before different bodies. If the canvassers are to declare the result, why the separate certificates? And then the unreasonableness of making such a difference between a special and general election. What calls for it? But it is urged that former acts provided, as to the certificates at general elections, that "said clerk shall lay the same before the county court at its next session," whereas the act of 1891 omits this provision as to a general election, but retains it as to a special election. If this does not sustain the theory that only the canvassers can act, no other provision does. This clause may be dispensed with entirely without affecting the power of the county court, for the act requires the election officers to make certificates and deliver them to the clerk in the case of general and special elections. For what purpose? Plainly that he may lay them before the court, for there is the clause saying: "Said court shall thereupon ascertain and declare the result of said vote, and enter the same of record." This clause applies to both general and special elections. On what can the court act but on those certificates? The law intends them in both elections for their action. They are sent to the court, because sent to their clerk. His custody of them is the custody of the court. Why say that the clerk shall lay them before the court? If it is said that the fact that it requires the clerk to lay the certificates before the court in a special election excludes the idea that he is to do so also in the case of a general election, I answer this is at most only an implication, and that, if it had been the intention to have the clerk lay them before the board of canvassers sitting, not under th's act, but under chapter 3, section 68, Code,—a body not mentioned in this act,—we should reasonably expect, if this sharp distinction was in the brain

of the legislature, that it would have said so in words.. Scott's counsel contends that, as these certificates are not directed to be laid before the county court, they must go somewhere, and they go before the canvassers. I answer that this act does not say so, but, to the reverse, leaves the fair strong inference that they go before the court; and I answer, further, that they don't go before the canvassers under section 68, chapter 3, because that in terms is limited to a canvass as to candidates for office, and never mentions the canvass of returns to remove a county seat, and confers no power on the canvassers as to that. The form of declaration of result gives a place for every candidate "for office," but no place for a candidate for a county seat. This section knows not that such a candidate is running. Why carry these certificates to a tribunal knowing them not, whose power of attorney is silent as to them?

And now, as a telling argument, contemplate the great evil ensuing upon the construction of the act contended for. The case of *Brazie* v. *Commissioners*, 25 W. Va. 213, holds that canvassers have no power to go behind the returns to inquire as to fraud or illegality in the election. Thence it would follow that, if the board of canvassers act on a county-seat election, fraud would go unchallenged, and the result must be declared by the returns, however tainted by fraud. There is statutory provision for a contest given to a candidate defeated by fraud, but none in the case of a county-seat vote. If the construction of the statute contended for by Scott is given it, the result is, as JUDGE GREEN said in the *Poteet Case*, that one running for the petty office of constable has remedy against fraud, but the opponents of a fraudulent removal of a county seat—a most important matter—have none. If the act is given the construction that I contend for, we preserve the remedy laid down in the *Poteet Case*. If we give it the effect of changing the law so as to carry the returns before the board of canvassers, we ought, as a sequence, for reasons stated so well in the *Poteet Case* as a necessity, vest in that board power to go behind the returns, and hear evidence of fraud and illegality. But that would be a total change in the character of that tribunal, and counsel for Scott repudiates that result. If canvassers cannot go behind returns, then *certiorari* would not answer to meet

fraud, as the fraud could not be made to appear. It is suggested by counsel that chancery would entertain jurisdiction. Why destroy the remedy already existing to go abroad seeking a doubtful remedy, and that by mere construction of a statute by implication? In fact, equity disclaims jurisdiction in cases of contested elections. It does not overthrow elections, or try title to office, as will be seen in that late excellent work, American & English Decisions in Equity (volume 3, pp. 413, 437), *Alderson* v. *Commissioners*, 32 W. Va. 643, (9 S. E. 868). Though a vote upon removal of a county seat is not an "election" in strict sense, yet this rule of equity might apply by analogy. However, as this is not an election for office, but only on a public question, it may be that equity would take jurisdiction by injunction to prevent a county court from removing a county seat under a vote tainted with fraud. As shown by cases collected in the work just cited (page 439), this may be done; but the cases conflict. Be this as it may, it is no reason for changing the well-considered case of *Poteet* v. *Commissioners*, and destroying the ready remedy it gives, without very plain language from the legislature. The object is to reach the intention of the legislature. 1 Bl. Comm. 61. Is it reasonable to say that it intended to make a difference between special and general elections as to the tribunal declaring the result? Why so? Why not harmonize by committing the power to the county court in both cases? Why make a difference, especially when it destroys an essential remedy? The new law retains the feature that in both elections separate certificates shall go to the clerk, and the general clause that the county court shall declare the result, and retains the clause that the clerk shall lay the certificates before the county court, but only says so as to a special election. This is a mere inadvertence of drafting. The draftsman intended it as to both general and special elections. If he had intended them in a general election to be laid by the clerk before another body, would he not have said so? The clause that the county court shall declare the result is controlling. "Where the law antecedently to the revision was settled, either by clear expression in the statute or adjudication thereon, the mere change of phraseology shall not be deemed or construed a change of the law, unless such

phraseology evidently purports an intention in the legislature to work a change. A contrary construction might be productive of the most dangerous consequences." *Parramore* v. *Taylor*, Grat. 220, 243; 1 Minor Inst. 41. *Owners* v. *Bragdon*, 121 Grat. 685; *Vaughan* v. *Jones*, 23 Grat. 403. The motive of the act of 1891 was to change the old law only to the extent of allowing a vote at a special election. It was not intended to allow the county court to canvass a vote only at a special, and not at a general, one, and thus take away the citizen's right to contest an illegal vote on the removal of a county seat. Such change does not speak from the act. If the construction contended for by Scott is correct, it results in this anomaly: that a vote at a special election can be contested for fraud or other illegality, but one at a general election cannot be. This was never intended. This alone is enough to repel that construction, though other reasons supplement and fortify it. I should add the argument that the act not only requires the county court to "ascertain and declare the result of said vote," but elsewhere also says that, if three-fifths of the votes be in favor of relocation, "the said county court shall enter an order declaring the place so receiving three-fifths of all the votes cast therefor to be the county seat." Now, if the intent was that the canvassers should canvass the returns, we would look for some provision to certify from the canvassers to the county court the result of the canvass, to enable it to make such an order. There is none. Why? Because it was intended that the county court shall canvass, and as the result would be on its own record, there was no need of a certificate of the result of the canvass. If we could say, even, that the act does not provide what body shall declare the result of a vote at a general election, what then? As it is the county court that entertains the proceedings for relocation by receiving the petition for a vote, and ordering it, and the certificates from the precincts are in the custody of the clerk, we would say that it was also to declare the result, not the board of canvassers, as was held in *State* v. *Whitney*, 12 Wash. 420; (41 Pac. 189.)

A taxpayer or a voter of a county, merely as such, may appear before the county court, and in any legal mode contest the returns of and vote upon a relocation of a county seat for

fraud, irregularity of illegality, or other ground which in law would change the result or overthrow the vote, in whole or part. This is presented in brief of Brown's counsel, but is not contested. *Poteet* v. *Commissioners*, 30 W. Va. 59, (3 S. E. 97); *Welch* v. *County Court*, 29 W. Va. 63, (1 S. E. 337); *Hamilton* v. *County Court*, 38 W. Va. 76, (18 S. E. 9); *Kriecshel* v. *Board,* 12 Wash. 436, (41 Pac. 186).

In deference to the extended oral and printed argument of counsel, I have said too much in the case. I regard it as quite plain. From these views it follows that we must award a peremptory *mand imus* to Brown to compel the county court to take jurisdiction, and take up the returns of the vote, and canvass them, and recount the ballots, and hear evidence touching fraud and illegality in the vote, if asked, and declare the result, and enter it of record; and we must award the writ of prohibition sought by Brown against the board of canvassers prohibiting it from exercising any jurisdiction whatever over the certificates and returns of said vote, and we must refuse the *mandamus* asked by Scott, Davis, and Wilson to compel the board of canvassers to proceed with the canvass of said vote.

Note by Dent, President:

So far as the opinion of Judge Brannon holds that the county court has authority to hear and determine contests with regard to the relocation of a court house, it is undoubtedly legislation by judicial construction to supply as a matter of necessity an inadvert nt omission in the statute. The same may be said of the decision in the case of *Poteet* v. *Commissioners*, 30 W. Va. 58, (3 S. E. 97). But to hold otherwise is to deny to the taxpayers the undoubted right to inquire into and know whether their court house has been relocated in the manner provided by law  And for this reason, though reluctant to usurp legislative functions, I concur in the proposed judicial amendments of the statute to prevent a denial of the just rights of those in interest. Judge-made law, in such an unforseen event, is better than no law. It is at least in accord with, and preservative of, that favorite maxium of the courts of common law, founded on fiction though it be, that "there is no right without a remedy." *Charleston & S. Bridge Co.*, v. *Kanawha County Court*, 41 W. Va., 676, (24 S. E. 1002).

*Writ Granted.*