Raymond J. Funkhouser *v.* A. D. Landfried *et al.*

(No. 9407)

Submitted September 16, 1942. Decided September 24, 1942.

Kenna, Judge, and Fox, President, dissenting.

*W. French Boggess, Eugene T. Hague, Phillip Hill* and *Randolph Bias*, for petitioner.

*C. E. Goodwin, Oliver D. Kessel* and *R. Dennis Steed*, for respondents.

Rose, Judge:

Raymond J. Funkhouser was awarded a rule by this Court requiring A. D. Landfried, J. C. Fisher and Frank Blackshire, as commissioners of the County Court of Jackson County and as such, ex officio members of the board of canvassers of said county, together with Chapman Revercomb and John L. Gillespie to show cause why a peremptory writ of mandamus should not issue as prayed for in the petition filed.

The members of the board of canvassers filed a joint demurrer in writing to this petition and a joint return and answer to the rule issued, as did also the respondent Revercomb. Mr. Gillespie made no appearance.

The petition charges in brief that the relator Funkhouser and the respondents Revercomb and Gillespie were rival candidates at the primary election held August 4th for the Republican nomination for the United States Senate; that after said primary election, at the relator's instance, recounts were demanded and have been held in twelve counties, and that like recounts are being held in at least six other counties; that on the day on which the petition was prepared the then tabulation of votes showed 47,330 for the relator and 47,473 for the respondent Revercomb, with Gillespie's vote smaller than either; that the relator is informed and believes that when all of the legal votes in the state for this nomination are finally determined and counted he will have a plurality thereof; but that if certain votes for this nomination cast in precinct No. 39 in Jackson County and charged by the relator to be illegal are not eliminated, this result may be changed adversely to him. The returns from this district show 24 votes cast for the relator and 44 for the respondent Rever-

comb. All are charged to be invalid for the reason that it is plainly apparent from a comparison of the signatures on the poll book and those upon the registration book that none of the voters signed the poll book as required by law, but that their names were signed thereto by a poll clerk. Other irregularities are charged, but were expressly abandoned upon submission of the case. No fraud is charged against any voter or election official. The votes were not challenged. The failure of the voters to sign the poll book was discovered upon the recount had on the demand of the relator. A prompt motion was made by him to have the election officers summoned to give evidence regarding these irregularities, which motion was denied. The prayer is that the board of canvassers show cause why they should not be required to bring in these election officers for examination on the question of the legality of the signatures on the poll book and other alleged irregularities; that if it shall be found that all the names written thereon were written by one person, or not written by the voters, the board be required to reject all of said votes and to make a new declaration of the results of the primary election in Jackson County and a proper certificate thereof, omitting all the votes from precinct No. 39.

. The question raised by demurrers on the issue to which the proceeding was finally narrowed down may be summarized as follows: (1) Whether the canvassing board on a recount had jurisdiction to hear and determine the question as to who signed the names on the poll book; and (2), if the board had such jurisdiction, whether the signing of the poll book by a voter is a prerequisite to his right to vote. The answers filed raised the same questions and denied no allegations of the petition material to the final issues involved, except that the names of the voters on the poll book were signed by one person. On the hearing here, the relator filed the poll book and registration book of precinct No. 39 for what he calls "occular demonstration" that the names on the poll book were actually signed by one person, and filed also the

affidavit of the poll clerk, in which he states that he in fact did,. through error, but innocently, sign all the names thereon. This clerk was offered for cross-examination by respondent, but no questions were asked.

The affidavit of the poll clerk and a comparison of the names on the poll book and those on the registration book leave no possible doubt that the names on the poll book were all written by the clerk and that no voter signed the poll book before casting his ballot or since. Respondents do not contend that these facts are not clearly shown. Also, neither the pleadings nor the evidence show any taint of fraud on the part of either the election officials or the voters. For practical purposes nothing remains in controversy except the purely legal questions summarized from the demurrers.

We must first determine whether, as the statute now stands, on a recount of the ballots by the board of canvassers, a candidate can raise the questions here involved. It is said by the respondents that such matters can be litigated only in an election contest as distinguished from a recount. This question must be answered from the Code. The powers of the canvassing board are purely statutory, and the statute changes from time to time, hence old cases must be followed with caution.

We find no provision in the statute relating to primary elections governing recounts, except section 20-a, article 4, Chapter 44,. Acts of 1941, which reads as follows: "The provisions of article five of this chapter, relating to the recount of votes in final elections, shall, to the extent that they are applicable, be operative in primary elections." This reference is to article 5 of chapter 3 of the Code, section 33 of which prescribes the duties of a canvassing board, and has this, and only this, provision relating to recounts: "After canvassing the returns of the election, the board shall, upon the demand of any candidate voted for at such election, open and examine any * * * ballots, and recount the same," followed by certain instructions for disposing of the recounted ballots and making of certificates of the result thereof. Apparently, therefore, the only

difference between an original canvass and a recount is that in the latter proceeding the actual ballots are inspected and recounted. It may be assumed, therefore, that on the recount the canvassing board may consider any matter that might have been considered upon the original canvass of the returns.

The duty of the canvassing board in a primary election is stated in Code, 3-4-20, as follows: "When any such election is held in a county or district, the county court sitting as a board of canvassers shall meet at the courthouse thereof on Friday next succeeding any primary election, and publicly, carefully and impartially ascertain the result of such election in the county and district, and election precincts thereof, and cause to be prepared and recorded, in the primary election precinct record book, a table or tables which shall show, as to each candidate of each political party for each office, the number of votes cast for him at each precinct, and the total number thereof cast in the entire county." Nowhere does the statute expressly state what shall be considered by the board in ascertaining the result of the election. Necessarily such ascertainment must be based upon some data, and we find by section 19 of said article 4 that the "ballot boxes, ballots, registration lists of voters, poll books and other supplies for the precinct" must be returned to the clerk of the county court within twelve hours after the commissioners of election have completed their work. The canvassing board, therefore, has before it, in the custody of its clerk, these documents. Presumably, these are the instruments which they canvass, and poll books and registration lists are included among them. It would seem, therefore, arguendo, that on the original canvass, the board may consider all these documents, and certainly upon a recount, their right so to do ought not to be considered in any way reduced.

This conclusion is not without some doubt, but if the relator in the present case cannot raise this question upon a recount, he probably cannot raise it at all, since our statutes make no provision for contest by a candidate for

the nomination for a federal office. We, therefore, are inclined to construe the statute liberally in his favor and to resolve the doubt accordingly. We do not consider this conclusion at all at variance with the holding of this Court in the case of *State* v. *Hunter,* 86 W. Va. 544, 103 S. E. 678, in which it was held that the affirmation books then required to be signed by the voters to identify themselves with their particular party, could not be considered by the canvassing board. This result in that case was reached, however, by reason of the fact that the affirmation books were segregated from all returns of the election and delivered to another officer who was required to keep them sealed for presentation to the grand jury, and hence never were "before" the board.

The requirement that persons offering to vote must sign the poll book came into our statute law for the first time in section 17, article 4, Chapter 44, Acts of the Legislature of 1941, the pertinent provisions of which are as follows: "Any person offering to vote in a primary election shall be given a ballot by the poll clerks. Such person shall sign his name in the space marked 'signature of voter' on the poll book prescribed in section thirteen of this article." Is compliance with this requirement a mandatory pre-requisite, or a condition precedent, to the right of a person to vote in a primary election? It will be noted that the statute is mandatory in form, but that nowhere in the act is it said that failure to comply therewith shall incur as a penalty the loss of the right to vote. Neither this particular penalty, nor any penalty whatever necessarily results from failure to conform to this one of the many steps prescribed as part of the process of casting a vote, unless we find that statute expressly or by necessary implication so requires. The statute enumerates many things which it says "shall" be done by the voter in the preparation and casting of his vote. He "shall" sign the poll book; he "shall" forthwith retire to the booth and there prepare his ballot; he "shall" fold his ballot in a prescribed manner; he "shall" announce his name; he "shall" present his ballot to the commissioner of his own

party; he "shall" then retire from the election room; and he "shall" not again enter the election room except with permission of the commissioners of the election. All of these mandates are contained in the same section, and appear to be of the same dignity. No penalty or consequence is fixed for failure to observe any of them. None of them is in any way separated or differentiated from the others, and none is especially emphasized. They seem to constitute merely successive steps in the process of casting a vote.

It would have been perfectly simple for the Legislature to have made the signing of the poll book a condition precedent to the right to cast a vote, if it had intended so to do. In fact, that body did at one time require all persons offering to vote in a primary election to sign a book and did make this prerequisite a mandatory requirement for voting. In Chapter 5 of the Acts of the Third Extraordinary Session of the Legislature of 1916, section 13 reads, in part, as follows: "On entering the election room, the voter shall announce his name, and if he is duly registered, or has obtained a transfer as provided by law, he shall sign his name and place of residence in a book of the party whose ballot he wishes to cast, which book shall be paged alphabetically, and have at the top of the page thereon in form and effect the following oath or affirmation with blank spaces properly filled in as to the party and precinct as indicated: * * *. Having so signed, said voter shall be allowed to cast the ballot of his party named in said oath or affirmation." It is perfectly plain that this statute expressly made the signing of the affirmation book necessary before voting, and it was so held by this Court. Our present statute, although saying, as did the act of 1916, that the voter shall sign, wholly omits any provision expressly making the signing a prerequisite to voting. It must be kept in mind that all statutory regulations of voting must be subordinate to the constitutional provision that "* * * citizens of the State shall be entitled to vote at all elections held within the counties in which they respectively reside; * * *," with certain exceptions,

not here pertinent. Constitution of West Virginia, Article IV, Section 1. It is true that section 12 of the same article provides that "The Legislature shall enact proper laws for the registration of all qualified voters in this State." But, of course, this authority to require registration of voters, does not empower the Legislature to nullify or modify the constitutional right of a citizen to vote. Hence, registration laws must be framed with great caution, and construed liberally and favorably toward the right to vote. The failure of a voter to perform an act prescribed by the election statutes ought not deprive him of the privilege of voting, unless the statute plainly and clearly, by express provision or necessary implication, requires that result. We find no such express provision in any statute and can discover no sound implication to the same effect.

On the contrary, we find in the legislative history of the amendatory act of 1941 what we regard as absolute evidence that the Legislature in the enactment of the present statute expressly determined and intended that the failure to sign the poll book should not cost the right to vote. Section 17 of the amendment, as originally presented to the Legislature, read as follows: "Before any person offering to vote in any primary election receives a ballot from the poll clerks, he shall sign his name in the space marked 'signature of voter' on the poll book prescribed in section thirteen of this article. After the poll clerks shall have ascertained that the signature of the voter on the poll book corresponds with the signature of the voter on his registration record, he shall be allowed to cast the ballot of the party of which he is registered as a member." This language expressly making the signing of the poll book a prerequisite to voting was wholly eliminated from the bill by amendment, and nothing of like import was substituted or is found in the final enactment. Nothing more decisive of the legislative intent is conceivable. The omission of the statute to state that no person can vote without signing the poll book was no oversight, but was intentional and deliberate. We conclude, therefore, that

the failure of all the voters in precinct No. 39 in Jackson County to sign the poll book, in the absence of fraud or proof that the votes are otherwise illegally cast, is not sufficient ground for disregarding these votes. This conclusion must not be understood to imply that the statutory requirement that persons offering to vote shall sign the poll book is nullified or rendered futile. This signing is one of the means of identifying voters, perhaps the most important, and should be rigorously enforced by election officials. But, where the failure to sign the poll book resulted from an innocent and mutual mistake by both voters and the officials, and the voters were otherwise qualified, the ballots of such voters will not be held to be invalid for that reason alone.

The relator has not shown a right to the writ which he seeks; therefore, the rule heretofore awarded herein is discharged and the writ denied.

*Writ denied.*

KENNA, JUDGE, dissenting:

I reluctantly disagree with the majority for the following reasons which I consider impelling.

It is quite generally known that the broad purpose of the Legislature in enacting the Permanent Registration Law, of which the act before us is a declared integral part, at a time when good government is being put to a test for life, was to exact and require a more rigid procedure to be followed in the holding of elections, for the purpose of preventing fraud and other disturbing practices. It is equally well known that one of the most reprehensible of those practices was and is the substitution of a "repeater", or other illegal voter, to procure and cast the ballot of a registered lawful voter whose identity can be imitated. In order to attempt to stamp out that rather cunning thievery, the lawmakers provided that when registering, voters, with certain clearly defined exceptions, should fill out and sign two registration cards answering prescribed questions. After providing that the

signature of the applicant for registration on "both of filled forms" shall be written in *ink*, which in itself indicates the legislative purpose to make that requirement mandatory, sections twenty-eight and twenty-nine with great exactness deal with the circumstances under which *alone* the registrant shall be excused from signing the registration record. Those sections read as follows:

Sec. 28. *Registration of Applicants Unable to Write.*—If an applicant, although physically able, shall allege inability to sign his name, the registrar or clerk of the county court shall require him to present an affidavit of a qualified elector within the same county who is personally acquainted with the applicant. Such elector shall, in his affidavit, state his own residence and affirm that the statements made by the applicant for registration are true. Upon the presentation of such affidavit, the applicant shall be permitted to sign the registration form by making his mark.

If an applicant is literate, but physically unable to sign his name, the registrar or clerk of the county court shall insert the name of the applicant on the registration form together with a notation of the nature of the disability."

"Sec. 29. *Disability Suffered Since Registration.*—Any voter who has since the time of registration suffered a physical disability which renders him unable to sign his name, may at any time except the two weeks immediately preceding any election personally make application under oath to the clerk of the county court to have such fact entered on his registration record, together with a statement of the exact nature of his physical disability, and such entry shall be made accordingly. If such applicant is physically unable to appear before the clerk of the county court to cause such change to be made on the registration record, he may request the clerk of the county court to mail him the necessary forms, and the clerk of the county court upon receipt of such forms properly filled, together with a physician's certificate affirming such disability, shall alter the registration record of the voter accordingly: *Provided,* That when the clerk of the

> county court shall ascertain that any voter who has declared himself physically disabled or illiterate, no longer suffers from such disability or illiteracy, he shall forthwith cancel on the registration record the entry relating to physical disability or illiteracy and shall notify such elector by mail of his action."

There is no question that the requirement of the Permanent Registration Law to sign the registration cards is mandatory, the Legislature having prescribed the only conditions under which it is to be excused. Obviously, it was the plain purpose of the Legislature that that act should be read in *pari materia* with the act now before the Court when it stated that it was its purpose of integrate "the machinery of primary and general elections." The two acts were contemporaneously adopted.

There can be no doubt, to my mind, from anything approaching a logical deduction that the provisions requiring the voter to sign the registration cards and that requiring the signature on the poll book when he casts his ballot were intended to operate in unison and with equal force, they being the only two such requirements in the entire election law. Why require the prospective voters to sign the registration cards? The plain answer is based upon the corresponding requirement to sign the poll book. The signature is the generally adopted, outstanding means of identification. It operates only by comparison. It is utterly useless without that means. Consequently, the provision requiring the registration card to be signed would be no more effective than a one-ended bridge if there were nothing provided with which to compare that required signature. I, therefore, believe that to hold that the voter is not required as a condition precedent to casting his ballot, to sign the poll book devitalizes the entire act in question in a manner clearly counter to the purpose of the lawmakers.

What is said in the majority opinion concerning the amendment of the provision in question is the only matter of any consequence that can be urged to sustain the con-

struction adopted by the majority of the Court. I believe the act is entirely unambiguous, and if so, that a court seeking its construction is adopting a practice which, if followed in the future, will result in a tremendous amount of wasted energy. *Soon Hing* v. *Crowley,* 113 U. S. 703, 710, 5 S. Ct. 730, 28 Law Ed. 1145; *Shenandoah Lime Co.* v. *Governor,* 115 Va. 865, 80 S. E. 753, Ann. Cas. 1915C, 973. But let us approach the matter as though the legislative history actually entered into our process of reasoning, though the Supreme Court has termed it a "very unsafe and unreliable" approach. *Andrews* v. *Hovey,* 124 U. S. 694, 716, 8 S. Ct. 676, 31 Law Ed. 557.

What is an amendment to a proposed piece of legislation? No amendment is to be considered as though adopted for the purpose of emasculating the entire act or depriving it of its virility. All amendments are not to be considered as though the purpose for which they were offered has been actually accomplished and brought about by their adoption. It can, therefore, be conceded that the purpose of the amendment, perhaps, was to enable a voter to cast his ballot without signing the poll book. Amendments are usually matters of compromise, and the legislative history of the Permanent Registration Law, and of the acts integrated therewith, shows plainly that there was a powerful underlying opposition to their enactment. The suggested amendment probably was thought by some to accomplish one purpose, by others to accomplish another. Unless their meaning is perfectly plain, no amendment should be construed as overcoming in any vital aspect the outstanding purpose of the Legislature in enacting the statute in question. The fundamental or major purpose of the act is still the controlling feature in construing or interpreting the entire body of the act which is to be read as a whole. Therefore, amendments which are subject to a construction in full accord with the major purpose, or to a construction in diametrical conflict therewith, in spite of anything definite that might be shown to establish beyond peradventure the purpose of those sponsoring the amendment, are to be looked upon as though they had not altered the act in a manner that would render other vital remaining

provisions ineffective. If they change the act, the act itself necessarily must be preserved; otherwise there could be no change. A change does not annihilate; neither should an amendment. If the act is to be preserved, its admitted purpose must be put into effect. *Unity* v. *Burrage*, 103 U. S. 447, 457, 26 Law Ed. 405. (See 25 R. C. L. 999).

The discussion in the majority opinion concerning the use of the word "shall" in a non-mandatory sense seems to be an effort to maintain a negative premise to the end that that word, which appears dozens of times in our election laws, unless accompanied by the imposition of a penalty, means only legislative advice and not a binding rule of conduct. I believe that the plain purpose of the statute should outweigh the advanced rules of syntax, even when properly applied, and that it is not the usual legislative purpose nor intention to stop at advising the proper course of conduct. But even directory provisions of a statute must be substantially complied with. Here they were not.

The reference in the majority opinion to Article IV, Section 1 of our constitution defining the persons who shall be entitled to vote, of course, is to be read in the light of the last section of the same article imposing upon the Legislature the duty to enact proper laws for the registration of qualified voters, the latter section having been adopted to take the place of·a provision to the effect that no person should be denied or refused the privilege of voting because not registered. I believe that this specific question can be boiled down to the proposition that voting in this state cannot be limited nor restricted, but that it can and must be regulated at least with regard to registration, which, of course, is necessarily coupled with the concurrent right to regulate voting.

There having been a plain showing that those who voted at the precinct in controversy did not sign the poll book, I would award the peremptory writ.

Judge Fox concurs in this dissent.