ROBERT K. PARK, *et al.*

*v.*

A. D. LANDFRIED, *et al.*

(CC 776)

Submitted January 11, 1951.     Decided February 13, 1951.

*Wm. Bruce Hoff, Eugene T. Hague, Orville L. Hardman,* and *William L. Jacobs,* for plaintiffs.

*Oliver D. Kessel, W. F. Boggess,* and *P. E. O'Brien,* for defendants.

RILEY, JUDGE:

The relators, R. K. Park, B. M. Chambers, Ray E. Ritchie, C. E. Baker, W. J. Purdy, and Paul Cox, citizens and taxpayers of Jackson County, West Virginia, brought this proceeding in mandamus in the Circuit Court of Jackson County to compel A. D. Landfried, N. F. McBride and J. W. Sayre, Commissioners of the County Court of Jackson County, West Virginia, and as such *ex officio* the board of canvassers of elections held in Jackson County, West Virginia, to reconvene and reject certain ballots cast in a special school board levy election, held in said county on March 17, 1950, pursuant to Code, 11-8-16 and 17, the legality of which votes, according to relators' petition, as shown on the face of the election returns in the course of a recount previously conducted by the defendants under the coercion of a writ of mandamus issued by the Circuit Court of Jackson County, and to compel the defendants properly to certify the true and correct result of the election. The Circuit Court of Jackson County certified to this Court its rulings in overruling defendants' demurrers to relators' petition.

The Circuit Court of Jackson County had previously overruled a demurrer to a prior petition, and thereafter on June 1, 1950, awarded a peremptory writ. Then followed an attempt to certify the court's ruling to this Court, which attempted certification was not considered for the reason that the order was final and not certifiable.

The defendants in the first proceeding, who are the same as those herein impleaded, did not challenge upon the

writ of error the correctness of the circuit court's order, but proceeded with the ordered recount.

In the first proceeding, as now, the defendants contend that they are not *ex officio* the proper board of canvassers of the returns of the election; that the board of education is the proper board of canvassers of such returns; and that the relators, not being candidates but prosecuting this proceeding as citizens, residents, taxpayers and voters of Jackson County, have no right in the instant proceeding to a writ to correct the recount heretofore made by the board of canvassers.

Shortly before the Board of Education of Jackson County began to canvass the returns of the election, the board was served with an injunction issued by the Circuit Court of Jackson County upon a bill of complaint filed by the same persons as the relators herein, and the board of education and the individual members thereof were enjoined from conducting the canvass of the returns of said special election. The board of education and the individual members thereof filed a demurrer to the bill of complaint, which demurrer remains undecided.

On the same day the County Court of Jackson County, being in attendance at the courthouse, proceeded to and did canvass the returns, the result of which canvass showed that the levies were authorized by a vote of more than sixty percentum of the voters who cast their votes at the special election in favor of the additional levies.

The unofficial returns of the local election, which the petition alleges was held by the board of education pursuant to Code, 11-8-16 and 17, and not otherwise, showed that of the 4,633 votes purported to have been cast 2,784 had been voted for the levies and 1,849 against the levies, so that there were four votes in favor of the levies in excess of the statutory requirement of sixty percentum. As a result of the canvass, the defendants, acting as a board of canvassers, certified that 4,623 votes had been cast at the election, of which 2,780 had been cast for the levies, and 1,843 against the levies, so that on the basis of

such canvass there were six votes in favor of the levies in excess of the required sixty percentum. At the conclusion of the coerced recount of the votes cast in precincts Nos. 3, 18, 19, 20, 21, 22, 23, 24, 25, 26, 30, 31, 32, 33, 37, 38, 39, 40, 41, 42 and 43, the defendants, acting as a board of canvassers, on June 19, 1950, certified that of the 4,614 votes, which were entitled to be counted, 2,770 had been voted for the levies and 1,844 against the levies, so that 1.6 votes were cast in favor of the levies in excess of the required sixty percentum.

On the return date of the rule issued by the Circuit Court of Jackson County, in the instant proceeding, the defendants interposed an original demurrer to the petition, which was argued by counsel before the Honorable Lewis H. Miller, the regular Judge of the Circuit Court of Jackson County; and the court directed the preparation of a vacation order overruling the demurrer and requiring the defendants to make answer or return to the petition and rule on or before July 20, 1950, and continued the cause until that date for further proceedings. This order, however, was not entered for the reason that Judge Miller, determining on his own motion that because he was related by blood to some of the voters whose votes were under attack, declined to act. Later the case was heard before the Honorable John W. Hereford, Judge of the Sixth Judicial Circuit, upon argument upon defendants' original demurrer to relators' petition, and upon defendants' joint, several, amended and supplemental demurrers to the petition then tendered for filing. Then followed: (1) Judge Hereford's written opinion, to the effect that the joint, several, amended and supplemental demurrers to the petition should be overruled; (2) an order of November 6, 1950, overruling the demurrers and directing the instant certification; and (3) the certificate herein, dated November 6, 1950, and an order, dated November 6, 1950, filing the certificate, and the signing and transmission thereof to this Court.

In paragraph 11 of their petition relators challenge the correctness of the action of the board of canvassers in

tallying, counting and certifying, over objection, a total of twenty-four absentee voters' ballots, because applications therefor were not made to the circuit clerk ten days prior to the date of the election. It is alleged that these ballots are illegal under the provisions of Code, 3-6-2, which reads: "An elector, as designated in section one of this article, expecting to be absent from the State on the day of any primary, general or special election, may, not more than thirty nor less than ten days prior to the date of any such election, make application to the clerk of the circuit court of the county in which his voting precinct is situated for an official absent voter's ballot or ballots to be voted at such election." Relators further aver that the alleged invalidity and illegality of each and every one of the twenty-four absentee ballots were patently and manifestly apparent on the face of the returns, and it was unnecessary for the board of canvassers to have recourse to any extrinsic evidence to determine the legality or illegality of the questioned ballots; and, therefore, it was the mandatory and ministerial duty of the defendants, acting as a board of canvassers, in the course of the coerced recount to reject each and every one of the twenty-four absentee voters' ballots.

In relators' petition in paragraphs 12, 13 and 14, 16 several ballots cast by minors in precincts 18, 19, 20, 30 and 37; 65 ballots cast by nonregistered voters in precincts Nos. 18, 19, 20, 21, 23, 25, 26, 30, 37, 38, 40, 42 and 43; and 206 ballots cast by late registrants in precincts Nos. 18, 19, 20, 21, 22, 23, 24, 25, 26, 30, 31, 37, 38, 39, 40, 42 and 43, respectively, are charged to be manifestly and apparently invalid and illegal on the face of the returns without necessity of recourse to extrinsic evidence; and that it thus became the mandatory and ministerial duty of the said board of canvassers to reject each of such invalid and illegal ballots and to proportionately reduce the votes "for" and "against" said levies in said several precincts in the same proportions which the votes for and against the levies in said precincts bore to the sum total of such invalid and illegal ballots. It is further charged in the

latter part of paragraph 14 of the petition, and in paragraph 15 thereof in regard to the foregoing grouping of ballots, totaling 287, that: (1) In precinct No. 18, 366 ballots were cast for the levy and 8 against, of which 61 were illegal ballots, consisting of the ballots of 4 minors, 6 nonregistered voters, and 51 tardily registered voters, making 53 illegal votes necessarily cast for the levy; (2) in precinct No. 19, 498 ballots were cast for the levy and 3 against, of which 68 were illegal ballots, consisting of the ballots of 6 minors, 24 nonregistered voters, and 38 tardily registered voters, making 65 illegal ballots necessarily cast for the levy; (3) in precinct No. 20, 494 ballots were cast for the levy and 4 against, of which 81 were illegal ballots, consisting of the ballots of 4 minors, 10 nonregistered voters, and 67 tardily registered persons, making 77 illegal ballots necessarily cast for the levy; (4) in precinct No. 37, 98 ballots were cast for the levy and 5 against, of which 11 were illegal ballots, consisting of the ballots of 1 minor, 2 nonregistered persons and 8 tardily registered persons, making 6 illegal ballots necessarily cast for the levy; and (5) in precinct No. 38, 86 votes were cast for the levy and 4 against, of which 8 were illegal, consisting of the ballots of 2 non-registered persons and 6 tardily registered persons, making 4 illegal votes necessarily cast for the levy. So that, as the petition alleges, in precincts Nos. 18, 19, 20, 37 and 38 there were cast for the levy 205 illegal votes.

The petition further alleges that 6 challenged votes were illegal but were counted by the board of canvassers on the recount, as follows: In precinct No. 30 the challenges were directed against the ballots of Mildred Scarberry and Elmer W. Scarberry, who, though registered in that precinct, last registered for voting in the State of Pennsylvania; but no evidence was introduced against the challenge and the board refused to permit evidence to be introduced in support thereof; in precinct No. 38 a challenge was directed against a vote purportedly cast by Laurene McCardy Boyd, though no person of that name appeared on the registration lists, and the petition alleges that if

Laurene McCardy Boyd is the same person as the person who is registered as Laurene A. McCardy, the challenged vote is illegal because the voter had failed to register after her name was changed to Laurene McCardy Boyd, as required by Code, 3-2-35; and that a challenge was directed to three allegedly fugitive absentee ballots of Eileen Parsons, Flayo Miller, and Lionel L. Parsons, the voters being properly registered in precinct No. 18, which ballots after the election on June 19, 1950, were taken from the returns in precinct No. 33 and placed in the proper ballot box in precinct No. 18, and on this ground it is charged that these three absentee ballots had lost their integrity, and, therefore, were improperly considered in the result of the recount.

Several questions, aside from the consideration of the allegedly illegal and void ballots, are presented by this record: (1) Did the county court have the right to canvass the returns of the election; (2) were relators, not being candidates for office, entitled to demand that the board of canvassers reconvene to correct the recount theretofore made under the writ of mandamus issued by the Circuit Court of Jackson County; (3) are the registration lists and the applications which accompany the absentee ballots in their transmission from the absentee voters to the clerk's office a part of the returns of an election such as may be considered by a canvassing board on a canvass and on a recount; (4) is mandamus the proper remedy to correct a recount and direct the inclusion or exclusion of questioned ballots in the result of a levy election, held under Code, 11-8-16, 17; and (5) is it necessary to isolate ballots by challenge or otherwise, where by proper and direct mathematical calculation it can be ascertained by a canvassing board, either on the canvass or on the recount, that a certain number of illegal ballots in a precinct were cast?

The position taken in this proceeding by respondents, members of the County Court of Jackson County and, as such, *ex officio* the board of canvassers, is that the board of education and not the county court initially had the

right to canvass the returns of the special school levy election, and is diametrically opposite to the position taken by the board, when it voluntarily proceeded to and did canvass the returns and declare the results of the canvass. Such inconsistency on the part of a public body in a matter deeply involving the public interest, such as a school levy election, can only be explained, if the respondents are right in their present position, on the ground that at the time the board of canvassers voluntarily and without judicial coercion made a canvass of the votes, they were either not fully informed or were illy advised as to their rights and duties in the premises. Certainly the board was right when it canvassed the votes without judicial coercion by writ of mandamus or otherwise, and the position which the respondents take in the instant case was wrong, when they interposed their demurrer to relators' petition in the circuit court, and in the viewpoint of their eminent counsel expressed to this Court in their able arguments and briefs; or just the opposite is true.

Be that as it may, this Court, under the state of this record, can concern itself only with the power of a county court, acting as a board of canvassers to canvass the returns and conduct a recount upon the demand of persons who are only citizens, residents, taxpayers and voters, for, if the canvass in the first instance was without legal authority, both it and the coerced recount, as well as the judicial proceedings in the Circuit Court of Jackson County, prior to the instant proceeding, are clearly abortive, in which case we have before us a school levy election held under Code, 11-8-16 and 17, following which there has been, in fact and in law, neither a canvass nor a recount.

On the question immediately before us as to which of the two governmental bodies had the right to conduct the canvass, our attention has been invited to and we have found no West Virginia case directly in point. But counsel for the respondents rely on the leading case of *Brown v. Randolph County Court,* 45 W. Va. 827, 32 S. E. 165, in which this Court held that the County Court of Randolph County, acting as such, had the right to canvass

the returns of an election held under Chapter 31, Acts of the Legislature, 1895, on the relocation of a county seat. This Act provided for the submission to the voters of a county the question of the location of a county seat at either a general or special election, but the statute was silent as to what governmental body should conduct the canvass of the returns, recount the ballots, and review other matters *de hors* the face of the returns. However, it was provided in Section 15 thereof that, as to a general election, at which the vote in the *Brown* case was demanded, the commissioners of election "shall make out and sign a separate certificate of the result of said vote, and deliver the same to the clerk of the county court * * *. Said court shall thereupon ascertain and declare the result of said vote and enter the same of record." In the *Brown* case this Court held that the members of the county court, acting as a board of canvassers, had no right to go beyond the canvass of the returns of the election, citing *Brazie* v. *Fayette County Commissioners,* 25 W. Va. 213, and that the county court, as such, should canvass "the returns upon the certificates, can recount ballots, hear evidence of fraud and illegality, and do what in the case of candidates for office can be done by that court in hearing had been voted for the levies and 1,849 against the levies, a contest. *Poteet* v. *Commissioners,* 30 W. Va. 58, (3 S. E. 97)." In that case the Court, confronted with the postulate of the *Brazie* case, that canvassers have no power to go behind the returns to inquire as to fraud or irregularity in an election, held *ex necessitate* that a county court, as such and not as *ex officio* the board of canvassers of a county in an election to determine whether the county seat should be changed, should not only canvass the returns and recount the ballots, but should go behind the returns and hear evidence not appearing on the face thereof of fraud and irregularities. On page 833 of the Brown opinion this Court, speaking through Judge Brannon, said: "And now, as a telling argument, contemplate the great evil ensuing upon the construction of the act contended for. The case of *Brazie* v. *Commissioners,*

25 W. Va. 213, holds that canvassers have no power to go behind the returns to inquire as to fraud or illegality in the election. Thence it would follow that, if the board of canvassers act on a county-seat election, fraud would go unchallenged, and the result must be declared by the returns, however tainted by fraud."

In the *Poteet* case, which involved the relocation of the county seat of Cabell County, and was decided on June 29, 1887, the statute, Chapter 5, Section 15, Acts of the Legislature, 1881, which for the first time specifically enacted that a county court, as such, and not acting as a board of canvassers of the county, shall determine the result of an election involving the location of a county seat, like the statute under consideration in the *Brown* case also was silent as to what governmental body should canvass the returns, recount the ballots, and hold a contest involving such relocation; but likewise provided that the commissioners of election shall sign and deliver separate certificates of the result of the vote to the clerk of the county court and "The said court shall thereupon ascertain and declare the result of said vote and enter the same of record." Judge Green in the *Poteet* case, in rejecting the position of counsel for plaintiff in error therein that the Acts of the Legislature, 1881, Chapter 5, Section 15, conferred upon the county court simply the power to examine the returns of the precinct officers and enter the result in the order book, said, on page 79 of the opinion: "This would present the strange anomaly that, while the certificate of the election of a constable would be only *prima facie* evidence of such election, and the court upon a contest would have to give the question a thorough investigation and determine who had received the actual majority of the legal votes cast, and enter of record the result, thus, it might be, setting aside and destroying the certificate given by them as a canvassing board, a record of the result of an election upon the re-location of a county-seat, no matter how notorious and gross may have been the frauds committed at the polls, or how many illegal voters may have been allowed to vote for one location, or how many legal voters may have been excluded from

voting against such location, or how outrageously and notoriously false may have been some of the certificates, must be regarded as conclusive and not reviewable by the Circuit Court or in any other manner. If we would preserve a republican form of government, it is of the first importance that the will of the people should not be thus fraudulently thwarted. Whenever the law has submitted any question to a popular vote, we would expect as a matter of course, that ample means would be provided, whereby false and fraudulent certificates of persons who held the election as to the result might be set aside and disregarded, and in no case would the law make such certificate conclusive evidence of the vote cast. The continuance of a republican government depends on the purity of elections. The certificate of the commissioners, when acting as a board of canvassers *are* not final and conclusive in any single instance. Ample provision is made for going behind these returns and ascertaining how the legal voters have voted, when voting for any officers from a constable to the governor, yet we are called upon to decide that the mere certificate of persons holding elections at precincts are conclusive, when the question is the relocation of a county-seat, a question which the masses of the people are much more interested in than in the person, who may have been elected to some petty office."

Thus in the *Brown* and *Poteet* cases, in which the statutes under consideration were silent as to what governmental body should conduct a contest in an election involving a change in the location of a county seat, this Court held by virtue of the very public necessities of the case that the county court should conduct the canvass, recount the ballots and even hold the contest of such election. So in the instant case we are motivated by the same reasons of necessity, involving to the highest degree the public interest, to say that the right of the electorate of this State should be paramount in the minds of the members of this Court, so that every election, whether it be an election for a candidate for public office, or an election involving a change of a county seat, a proposed constitutional amend-

ment, or a levy election, should give to the voters ample protection against those who would, contrary to our system of government, stoop so low as to engage in election frauds.

As heretofore indicated, Code, 11-8-17, does not expressly provide as to what governmental body shall canvass the returns and recount the ballots, as did Code, 13-1-13, relating to bond elections, which provided that "The authorities calling bond elections shall canvass the returns * * *"; Code, 18-9-2, relating to school levy elections required on the petition of voters, which provided that in cases of special elections "The board calling the election * * * shall canvass the returns"; and Code, 11-8a-10, respecting elections for county-wide levy for district debt service, which provides that "The governing body calling the election shall canvass the results * * *."

Code, 11-8-17, however, contains the very pertinent provision, in view of its abyssmal silence as to the canvassing of the returns, that "All the provisions of the laws concerning general elections shall apply so far as they are practicable, except as follows: * * *"; and then follow the exceptions heretofore referred to as to special election statutes which contain no provision as to the canvassing body. Thus we are impelled to the idea, and have stronger reason for it than this Court had in the *Brown* and *Poteet* cases, that the remedy of the voter in a levy election, brought under Chapter 11, necessarily lies, as we have heretofore indicated, in Code, 3-5-33, which provides that in *every* election in a county the commissioners of county courts "shall be ex officio a board of canvassers."

The demurrants claim that relators were not entitled to require the board of canvassers to reconvene and correct the recount theretofore made under coercion of the writ of mandamus issued by the Circuit Court of Jackson County because of the peculiar wording of Code, 3-5-33, which reads: "After canvassing the returns of the election, the board shall, *upon the demand of any candidate voted for at such election,* open and examine any one or more of the

sealed packages of ballots, and recount the same; * * *." (Italics supplied).

This Court has not directly decided the question whether persons, who are only taxpayers, residents, citizens and voters of a county, may, under the provisions of Code, 3-5-33, demand a recount, and the only case bearing on the immediate question which has been called to our attention is that of *People ex rel. Decker* v. *Parmelee,* 22 Misc. Rep. 380, 50 N.Y.S. 451, in which the Court, as disclosed by pt. 1 syl., held: "Mandamus lies to require a recanvass of votes rejected in a local option election, *though express provision is made by statute* (Election Laws, Section 114) *for mandamus to compel recount of votes rejected, only on application of a candidate voted for.*" (Italics supplied). An examination of the statute under consideration by the New York Court in the *Parmelee* case (1 Laws of New York, 1896, page 977, Chapter 909, Section 114), discloses that the *Parmelee* case is in point with the instant case on the immediate question of the right of a person, not a candidate, but whose interest is that of a taxpayer or voter, to demand a recount where the statute is silent on the question. If we were to hold that in a school levy election, under Code, 11-8-16, 17, that Code, 3-5-33, precludes persons who are only taxpayers, residents, citizens and voters of a county from demanding a recount, there would be a serious question whether a contest would be available to such persons, and, as under the holding of this Court in *Brazie* v. *Commissioners, supra,* a canvassing board has no power to go behind the returns to inquire as to fraud and illegality in an election not appearing on the face of the returns, fraud in an election would go unchallenged, and the result declared solely on the basis of the return, no matter how grossly tainted with fraud is the election. The language of Judge Green in the *Poteet* case *paraphrased* is most pertinent here: "Ample provision is made for going behind those returns and ascertaining how the legal voters have voted, when voting for any officers from a constable to the governor, yet we are called upon to decide, that the mere certificate of the persons holding elec-

tions at precincts *are* conclusive, when the question is the * * * [validity of a school levy election], a question which the masses of the people are much more interested in than in the person, who may have been elected to some petty office." It would be an anomalous situation for us to hold that, notwithstanding the reference provision contained in Code, 11-8-17, that "All the provisions of the laws concerning general elections shall apply so far as they are practicable" that, though a candidate for constable or any other minor office is entitled, not only to a canvass of the returns, but a recount of the ballots, followed by a contest, and a taxpayer and resident of the county, who may be affected substantially in a financial way by the imposition of a school levy, is without the right to a recount or a contest. The high public interests involved in the immediate question prompt us to apply the reference provisions contained in Code, 11-8-17, and hold, as we do, and as the New York Court did in the *Parmelee* case, that notwithstanding Code, 3-5-33, which expressly gives only to a candidate voted for the right to a recount, that the instant relators were entitled to the recount, which the board of canvassers made under the coercion of the circuit court's writ of mandamus. Here the relators are not seeking to have a second recount: they are simply asking that the board of canvassers be compelled to reconvene and correct manifest errors, as shown by the face of the returns made during the course of the recount, which brought about a result not warranted by a proper appraisal of the face of the returns, and which may be directly in the face of the intent of the electorate. In *State ex rel. Simon* v. *Heatherly,* 96 W. Va. 685, pt. 3 syl., 123 S. E. 795, this Court held: "Where a board of canvassers recounts the votes cast at a primary election, and in such recount counts illegal ballots for a candidate, ascertains the result and adjourns, such board, at the relation of an opposing candidate who is thus defeated for nomination, may be compelled by mandamus under section 89, chapter 3, Code, to reconvene and correct any such recount." And on page 690 of the opinion in that case the Court stated: "The duties of the board are not

performed until they are performed legally; until that is done, its action may be controlled by mandamus." In *State ex rel. Revercomb* v. *Sizemore,* 124 W. Va. 700, 22 S. E. 2d 296, this Court held that a writ of mandamus may be awarded after a recount compelling the board of canvassers to rescind its order, rejecting certain ballots and requiring that the board include votes wrongfully rejected in its certification of the result of the election. To like effect see *State ex rel. Fanning* v. *Mercer County Court,* 129 W. Va. 584, 41 S. E. 2d 855. In *Stanton* v. *Wolmesdorff,* 55 W. Va. 601, pt. 2 syl., 47 S. E. 245, this Court held that "Under a *mandamus* awarded under section 89, chapter 3, Code, 1899, a canvassing board may be directed and compelled to count a particular ballot in a particular way or for a particular candidate"; and "When [as here] the right to be vindicated is also one in which the public has an interest, a prior demand [to an inferior tribunal] for action is not necessary." *State ex rel. Daugherty* v. *Board of Canvassers of Lincoln County,* 127 W. Va. 35, 45, 31 S. E. 2d 321. So we think the relators have the right to prosecute this proceeding, and cause the defendant members of the county court, acting *ex officio* as the board of canvassers of Jackson County, to reconvene and correct the recount heretofore made by such board as to any defects appearing on the face of the returns.

This brings us to the question as to what constitutes the returns of an election. As to the twenty-four absentee ballots, which relators claim were illegally cast because the applications for the ballots were not made more than ten days prior to the election, as required by Code, 3-6-2, we are of the opinion that the applications for the ballots are clearly a part of the election returns.

Code, 3-6-6, provides as to ballots of absentee voters that "The clerk of the circuit court of the county shall enclose the ballot or ballots in an envelope, unsealed, to be furnished by such clerk, which envelope shall bear upon the face thereof the name, official title and post-office address of such clerk"; and on the other side there is provided a

form of affidavit for an absent voter, which shall be executed before an officer authorized to administer oaths. In Code, 3-6-8, it is provided that upon receipt of the absent voter's ballot the clerk of the circuit court of the county shall forthwith enclose the same, unopened, together with the application made by such absentee voter in a large carrier envelope, which shall be securely sealed and endorsed with the name and official title of such clerk, and there shall be written thereon the words "This envelope contains an absent voter's ballot to be voted at precinct No. _____ in _____. district in _____ county, and must be opened only at the polls on election day while such polls are open;" and in that section it is also provided that the clerk of the circuit court shall insert the name of the district, county and the number of the precinct in which the absent voter intends to vote, and shall thereafter keep the same securely in his office until delivery is made by him as provided by Section 9 of said article. Section 9 simply provides for the delivery of the ballots to the election commissioner of the precinct in which the absent voter resides "before the closing of the polls"; and Section 10 provides that "At any time between the opening and closing of the polls on such election day, the commissioners of election of such precinct, in the presence of each other, shall open the outer or carrier envelope only, announce the absent voter's name and compare the signature upon the application with the signature upon the affidavit on the ballot envelope and upon the voter's registration record. In case the election commissioners find the affidavit properly executed and attested, that the signatures correspond, that the applicant is a duly qualified elector of the precinct, that he is duly registered, and that the applicant has not voted in person at such election * * * the election commisioner shall open the envelope containing the absent voter's ballot in such manner as not to deface or destroy the affidavit therein and take out the ballot or ballots inclosed therein, without unfolding or permitting the same to be unfolded or examined. The commissioners shall then deliver such ballot or ballots to the poll clerks,

who shall at once proceed to write their names on the back of each of such ballots in the same manner as other ballots are required to be endorsed. A commisioner shall thereupon deposit the same in the ballot box, * * *." Under these provisions of the Code, it appears that the application for an absent voter's ballot is part and parcel of the returns of an election, and it is only by resort to these applications that the alleged illegality of each of the twenty-four absentee ballots can be determined. It seems to follow that the board of canvassers should have resort to these applications, and if they are not timely made, as appears in this record, the question of the validity of the twenty-four ballots, in the absence of any misfeasance or misprision of the election officials, is for the board of canvassers on a canvass of the votes or upon a recount to consider.

As to the ballots which are claimed to be illegal because the voters failed to register before thirty days prior to the election, as required by Section 26, Article 2, Chapter 50, Acts of the Legislature, Regular Session, 1943, or because the voter was under age, or was not registered, as required by statute, these matters can only be ascertained by the board of canvassers by an examination of the registration lists. That such reference to the registration lists may be had by the board of canvassers and to the effect that where, on the face of the returns, it clearly appears that votes have been illegally cast, it is not necessary to challenge, we have the recent case of *Funkhouser* v. *Landfried*, 124 W. Va. 654, 22 S. E. 2d 353. In that case this Court on page 656 of the opinion said: "All [the ballots] are charged to be invalid for the reason that it is plainly apparent from a comparison of the signatures on the poll book and those upon the registration book that none of the voters signed the poll book as required by law, but that their names were signed thereto by a poll clerk." In point 1 of the syllabus of that case, the Court held: "Upon a recount of ballots cast at a primary election had at the instance of a candidate for the nomination for the United States Senate, the canvassing board has jurisdic-

tion, on the motion of such candidate, to consider and hear evidence relating to the names of the voters appearing on the registration book and the poll book, so far as they cast light on any questioned ballots under consideration by the board."

So we hold that the members of the County Court of Jackson County, sitting as a board of canvassers, and on the recount, had the right to and should have examined both the applications of the absentee voters and the registration lists for the purpose of determining: (1) Whether the absentee voters had made application for absentee ballots prior to ten days preceding the election; (2) whether any voters were under age, as determined by their registration cards; (3) whether any voters had not registered; and (4) whether any voters had failed to register prior to thirty days preceding the election.

After a careful consideration of this record, we are of opinion, and so hold, that: (1) The County Court of Jackson County alone had the right to canvass the returns of the election, and thereafter, as required by the writ of mandamus issued by the Circuit Court of Jackson County, to conduct the recount; (2) the relators, though not candidates for office, were entitled to demand that the board of canvassers reconvene to correct the recount theretofore made under the writ of mandamus issued by the Circuit Court of Jackson County; (3) that the applications, which accompanied the absentee voters' ballots to the office of the clerk of the circuit court and the registration lists are a part of the returns, and, as such, may be considered by the canvassing board on the canvass and on the recount; (4) that mandamus is the proper remedy to correct a recount and direct the inclusion or exclusion of questioned ballots in the result of a levy election held under Code, 11-8-16 and 17; and (5) in the appraisement of such election it is unnecesary to isolate the ballots by challenge or otherwise, where, by proper and direct mathematical calculation, it can be ascertained by the canvassing board, either on the canvass or the recount, how a certain num-

ber of illegal ballots in a precinct were cast. In taking this position this Court is fully aware that it is necessary in every county in this State that there be sufficient money to protect the free school system of this State, but, by the same token, the Court is fully aware that the integrity of elections should be paramount in the voters of this State.

At this point we direct attention to the fact that, if the instant levy election in Jackson County should be rendered invalid under the decision of this Court, the Board of Education of Jackson County has the right to call another election, but, after all is said and done, such election should be conducted within the rules prescribed by the statutes of this State, which were enacted for the specific purpose of preventing illegality in the conduct of elections. For this reason this Court, ever mindful that the free school system of this State should be properly financed, at the same time takes the position that it is the plain duty of every person conducting an election to see that the returns are properly canvassed, a recount properly had, and the right of contest allowed to every person, because wrongdoing in the conduct of elections in the State of West Virginia does not help good government within this State.

For the foregoing reasons, we are of opinion that the Circuit Court of Jackson County properly overruled defendants' demurrers to relators' petition; and that it is the duty of respondents, A. D. Landfried, M. F. McBride, and J. W. Sayre, Commissioners of the County Court of Jackson County, and, as such, *ex officio* the board of canvassers of elections held in that county, to reconvene, in accordance with the principles enuciated herein, to consider and reject any illegal ballots cast at the special school levy election, held in that county on March 17, 1950, pursuant to Code, 11-8-16 and 17; and in the determination as to whether certain ballots should be received or rejected, it is the plain duty of the members of that board of canvassers to review: (1) The registration lists; and (2) the applications for absentee voters' ballots.

*Rulings affirmed.*